IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-----------------------------------------------------------------X
                                                                 :
BAYER CROPSCIENCE AG,                                            :
                                                                 :
                        Plaintiff,                               :
                                                                 :   C.A. No. 10-1045-RMB-JS
                                                                 :
            v.                                                   :
                                                                 :
                                                                 :
DOW AGROSCIENCES LLC,                                            :
                                                                 :
                        Defendant.                               :
                                                                 :
-----------------------------------------------------------------X
```

**REPLY BRIEF IN SUPPORT OF PLAINTIFF BAYER CROPSCIENCE AG'S MOTION
FOR PARTIAL SUMMARY JUDGMENT ON DOW AGROSCIENCES LLC'S
<u>INFRINGEMENT OF CLAIMS 1-3 AND 8 OF U.S. PATENT NO. 6,153,401</u>**

| | |
|---|---|
| OF COUNSEL: | Frederick L. Cottrell, III (#2555) |
| | Jeffrey L. Moyer (#3309) |
| Robert J. Koch | Anne Shea Gaza (#4093) |
| Jay I. Alexander | Travis S. Hunter (#5350) |
| Arie M. Michelsohn | Richards, Layton & Finger, P.A. |
| MILBANK, TWEED, HADLEY & | One Rodney Square |
| McCLOY LLP | 920 North King Street |
| 1850 K Street NW, Suite 1100 | Wilmington, DE 19801 |
| Washington, DC 20006 | (302) 651-7700 |
| (202) 835-7500 | cottrell@rlf.com |
| rkoch@milbank.com | moyer@rlf.com |
| jalexander@milbank.com | gaza@rlf.com |
| amichelsohn@milbank.com | hunter@rlf.com |
| | |
| | *Attorneys for Plaintiff* |
| Dated:  February 9, 2012 | *Bayer CropScience AG* |

RLF1 5817032v. 1

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ................................................................................................................ ii

ARGUMENT IN REPLY .................................................................................................................... 1

I.   DAS's Construction Contradicts the Clear Definition of "Biological Activity of 2,4-D Monooxygenase" in the Patent Specification ........................................ 3

II.  Bayer's Construction is Consistent with the Usage of the Term "2,4-D Monooxygenase" at the Time of the Invention and is Consistent with Current Usage ............................................................................................................................ 5

III. DAS's Construction Excludes the Preferred Embodiment ................................................ 6

IV.  DAS's Construction Renders Dependent Claims Meaningless ........................................ 7

V.   Nothing in the Prosecution History Supports DAS's Construction or Contradicts Bayer's Construction ....................................................................................... 8

VI.  DAS's Construction of "Polypeptide" is Also Wrong ...................................................... 12

CONCLUSION ................................................................................................................................. 13

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A,*
  657 F.3d 1264 (Fed. Cir. 2011)............................................................................................4

*Alloc, Inc. v. Int'l Trade Comm'n,*
  342 F.3d 1361 (Fed. Cir. 2003)..........................................................................................13

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.,*
  512 F.3d 1338 (Fed. Cir. 2008)..........................................................................................13

*Bradley v. United States,*
  299 F.3d 197 (3d Cir. 2002)................................................................................................1

*Edwards Lifesciences LLC v. Cook Inc.,*
  582 F.3d 1322 (Fed. Cir. 2009)............................................................................................4

*Eli Lilly & Co. v. Actavis Elizabeth LLC,*
  676 F. Supp. 2d 352 (D.N.J. 2009) .....................................................................................1

*Epistar Corp. v. Int'l Trade Comm'n,*
  566 F.3d 1321 (Fed. Cir. 2009).................................................................................9, 12, 13

*Fromson v. Advance Offset Plate, Inc.,*
  720 F.2d 1565 (Fed. Cir. 1983)............................................................................................5

*Hoechst Celanese Corp. v. BP Chemicals Ltd.,*
  78 F.3d 1575 (Fed. Cir. 1996)..............................................................................................6

*Home Diagnostics, Inc. v. LifeScan, Inc.,*
  381 F.3d 1352 (Fed. Cir. 2004)............................................................................................8

*Markman v. Westview Instruments, Inc.,*
  52 F.3d 967 (Fed. Cir. 1995)...........................................................................................1, 5

*Martek Biosciences Corp. v. Nutrinova, Inc.,*
  579 F.3d 1363 (Fed. Cir. 2009).........................................................................................2, 4

*MBO Labs., Inc. v. Becton, Dickinson & Co.,*
  474 F.3d 1323 (Fed. Cir. 2007).........................................................................................2, 6

*Network Commerce, Inc. v. Microsoft Corp.,*
  422 F.3d 1353 (Fed. Cir. 2005)............................................................................................1

*North Am. Container, Inc. v. Plastipak Packaging, Inc.*,
 415 F.3d 1335 (Fed. Cir. 2005)..................................................................................7

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
 520 F.3d 1358 (Fed. Cir. 2008)..................................................................................8

*Pfizer, Inc. v. Ranbaxy Labs., Ltd.*,
 457 F.3d 1284 (Fed. Cir. 2006)..................................................................................7

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005).......................................................................... *passim*

*Powell v. Home Depot U.S.A., Inc.*,
 663 F.3d 1221 (Fed. Cir. 2011)..................................................................................6

*Praxair, Inc. v. ATMI, Inc.*
 543 F.3d 1306 (Fed. Cir. 2008)................................................................................13

*Raytheon Co. v. Roper Corp.*,
 724 F.2d 951 (Fed. Cir. 1983)....................................................................................6

*Schering Corp. v. Amgen Inc.*,
 222 F.3d 1347 (Fed. Cir. 2000)..................................................................................5

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
 242 F.3d 1337 (Fed. Cir. 2001)................................................................................13

*Sinorgchem Co., v. Int'l Trade Comm'n*,
 511 F.3d 1132 (Fed. Cir. 2007)..................................................................................7

*Vitronics Corp. v. Conceptronic, Inc.*,
 90 F.3d 1576 (Fed. Cir. 1996)................................................................................2, 6

*Watts v. XL Sys., Inc.*,
 232 F.3d 877 (Fed. Cir. 2000)..................................................................................13

**STATUTES & RULES**

35 U.S.C. §112, ¶4...................................................................................................2, 7

Fed. R. Civ. P. 56(b) ....................................................................................................1

-iii-

## ARGUMENT IN REPLY

DAS does not dispute any of the facts regarding the structure or operation of DAS's *aad-1* and *aad-12* genes in corn and soybean plants, or the AAD-1 and AAD-12 enzymes encoded by those genes. (D.I. 112 at 3-13; D.I. 172 at 4,n.1). Moreover, on close examination, no *material* dispute exists between the parties' respective experts on the technical background facts. The experts largely agree on the nature and nomenclature of the 2,4-D cleaving enzymes in question. No discovery as to facts or expert opinions is truly necessary for the Court to decide this motion.[1]

The *only* real dispute between the parties is as to what the '401 patent claims, which is determined by the intrinsic evidence, *i.e.*, the claim language, the specification and the patent prosecution history. DAS seems to think there is something magic about a *Markman* hearing such that the Court cannot decide a summary judgment motion without a *Markman* hearing. But courts have been deciding summary judgment motions in patent cases for years before and after *Markman* hearings were invented in 1996. The Federal Circuit has made clear that "[t]here is no requirement that the district court construe the claims at any particular time," *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363-64 (Fed. Cir. 2005), and the recent amendments to Fed. R. Civ. P. 56(b) emphasize that courts may address summary judgment "at any time." Because Bayer's motion involves the construction of two claim limitations at most, does not require any additional discovery, and a decision on infringement would substantially streamline the case, Bayer urges the Court to decide this motion independently of the parties' remaining claim construction disputes, all of which relate to patent validity.

The Court should grant Bayer's motion because Bayer's construction of the claim

---

[1] DAS's failure to file a Rule 56(d) affidavit identifying specific reasons why it cannot present facts to justify its opposition "is fatal" to its apparent claim of insufficient discovery. *Bradley v. United States*, 299 F.3d 197, 206-07 (3d Cir. 2002); *Eli Lilly & Co. v. Actavis Elizabeth LLC*, 676 F. Supp. 2d 352, 365-66 (D.N.J. 2009) (granting summary judgment in patent case, citing *Bradley*), *aff'd on relevant grounds*, 435 Fed. Appx. 917, 919 (Fed. Cir. 2011).

limitation "biological activity of 2,4-D monooxygenase" is correct and DAS's construction is fatally flawed because:

- *First*, the inventors provided an explicit definition of "biological activity of 2,4-D monooxygenase" in the patent specification (Exh. A at col. 2, ll. 25-27 and ll. 65-67).[2] Where the patentee "act[s] as [his] own lexicographer" by defining a claim term, "the definition in the specification controls the meaning of [the term] regardless of any potential conflict with the term's ordinary meaning as reflected in technical dictionaries." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009);

- *Second*, the use of the term "2,4-D monooxygenase" was consistent with the usage in the art at the time of the invention. The "ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.*, as of the effective filing date of the application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). In fact, persons skilled in the art continue to use "2,4-D monooxygenase" to describe the enzyme in question even today;

- *Third*, under DAS's construction, the exemplary enzyme described in the patent specification (TfdA) would not be covered by the claims because, in DAS's view, TfdA is classified as a "dioxygenase" and therefore would be excluded from a patent claim limited to a "monooxygenase." However, a claim construction that excludes the preferred embodiment described in the patent specification is "rarely, if ever, correct." *See, e.g.*, *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); and

- *Fourth*, DAS's construction leaves dependent claim 4 with no relationship to the claim on which it depends (claim 1), in violation of the statutory mandate that dependent claims must relate to and further narrow the claim[s] from which they depend. *See* 35 U.S.C. §112, ¶4.

Put simply, the Court can accept DAS's position on the meaning of "biological activity of 2,4-D monooxygenase" only by disregarding the four black letter law canons of claim construction set forth above. We discuss each of these points below.[3]

---

[2] Exhibits are attached to the declaration of Edward J. Mayle, filed concurrently herewith.

[3] Bayer will also address DAS's non-infringement argument based on the construction of "polypeptide," which DAS added as an afterthought to its brief (D.I. 172 at 24-25). DAS neglected to timely disclose this non-infringement contention under the Court's Scheduling Order and Local Patent Rules. DAS's motion for leave to amend its contentions and Bayer's opposition are currently set for hearing before Judge Schneider on February 27, 2012. (*See* D.I. 123, 144, 130, 144, 152, 166).

I.     **DAS's Construction Contradicts the Clear Definition of "Biological Activity of 2,4-D Monooxygenase" in the Patent Specification.**

As Bayer pointed out in its opening brief, the '401 patent states that the exemplary *tfdA* gene described in the patent "codes for a 2,4-D [monooxygenase],[4] a polypeptide having the biological activity of bringing about the cleavage of the side chain of 2,4-D." (Exh. A at 2:25-27). The patent further equates the "biological activity" of this polypeptide (*i.e.*, "the protein encoded by tfda") to "its 2,4-D monooxygenase activity." (Exh. A at 2:65-67). The language in the specification thus provides a plain and clear definition of what was intended by the claim limitation "biological activity of 2,4-D monooxygenase."[5]

DAS does not dispute that its AAD-1 and AAD-12 enzymes cleave the side chain of 2,4-D. (D.I. 112 at 9-13, 19). That should end the matter and summary judgment should follow. DAS seems to think that the mechanism of action of the enzymes (*i.e.*, *how* the enzymes cleave the side chain) is important in this case. It is not. As discussed further below, nothing in the patent specification or prosecution history indicates that the claims were limited by the particular mechanism of cleaving the side chain of 2,4-D or by the particular name given to the enzyme.

DAS's entire argument is based on *extrinsic* evidence that, generally, scientists call an enzyme a "monooxygenase" if it places one atom of oxygen in water and they call an enzyme a "dioxygenase" if it places both atoms of oxygen in a substance other than water. (Bollinger Decl. ¶8, citing textbooks). The parties' experts do not disagree on this point, but it is irrelevant. Claim construction does not turn on how scientists, *in general*, name enzymes. The extrinsic evidence cited by DAS in its opposition and in its expert's declaration cannot contradict the inventors' clear definition in the specification of the claimed "biological activity of 2,4-D monooxygenase." *See*

---

[4] *See* D.I. 112 at 6 n. 8, regarding the typographical error in this passage of the patent.

[5] DAS accuses Bayer of focusing only on the statements at col. 2 of the patent (D.I. 172 at 3, 17). But these are the statements that provide the definition of "biological activity of 2,4-D monooxygenase" and additional passages exist in the patent specification that are consistent with this definition. (*See* D.I. 112 at 17-18).

-3-

*Phillips*, 415 F.3d at 1324 (court may consult extrinsic sources "as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence").

DAS seems to argue that the Court should not apply the Federal Circuit's caselaw which permits the inventor to be his own lexicographer because lexicographer status is reserved only to inventors who lack the wherewithal to use precise, correct scientific terminology in their claims. (D.I. 172 at 22-23). This is a misreading of the caselaw. The Federal Circuit has consistently stated that what is required is simply a "clear definition" in the patent specification. *See, e.g., AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329 (Fed. Cir. 2009); *Martek*, 579 F.3d at 1380.

Moreover, DAS's argument fails even on its own terms. The parties' experts agree that the complete mechanism of the exemplary TfdA enzyme described in the '401 patent was not known when the invention was made before 1987. Therefore, scientists could not have known whether the enzyme should formally be called a "monooxygenase" or a "dioxygenase." *See* Hausinger Decl. ¶2; Bollinger Decl. ¶15 (both pointing out that Hausinger first discovered the mechanism of action of TfdA in 1993).[6] Bollinger concedes that "[i]n the 1980s, scientists incorrectly believed TfdA to be a monooxygenase." (Bollinger Decl. ¶12). Hausinger explains that scientists used the term "2,4-D monooxygenase" because they observed the reaction by which a single atom of oxygen was added to 2,4-D to cause it to break down, and that this reaction appeared to be similar to other known "monooxygenase" reactions. (Hausinger Decl. ¶¶14-16). It is therefore undisputed that the inventors could not have used the term "dioxygenase" to define their invention when they

---

[6] The experts do agree that the TfdA enzyme adds one atom of oxygen to 2,4-D to cause it to break down to 2,4-DCP (Hausinger Decl. ¶2; Bollinger Decl. ¶13). DAS does not dispute that its AAD enzymes also have this activity. (D.I. 112 at 19, Hausinger Decl. ¶¶24-30; not addressed by Bollinger or DAS). This establishes infringement.

filed their patent application in the United States in 1987.[7]

### II. Bayer's Construction is Consistent with the Usage of the Term "2,4-D Monooxygenase" at the Time of the Invention and is Consistent with Current Usage.

Bayer's expert, Dr. Hausinger, further points out (without contradiction from DAS) that in 1985, Dr. Rob Don, the scientist who had isolated the genes for the enzymes that further break down 2,4-DCP (called *tfdB*, *tfdC*, *tfdD*, etc.) used the name "2,4-D monooxygenase" to describe the one gene that eluded him—*tfdA*.  (Hausinger Decl. ¶17; Exh. B).  Thus, "2,4-D monooxygenase" was the established name at the time for the enzyme whose gene the '401 inventors were seeking to isolate.[8]  This implicates the second canon of claim construction that DAS violates.  The Federal Circuit holds that claims are to be construed from the viewpoint of one of ordinary skill in the art at the time of the invention.  *Phillips*, 415 F.3d at 1313; *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353 (Fed. Cir. 2000); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 986 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996) (In construing claims, the courts focus on "what one of ordinary skill in the art at the time of the invention would have understood the term to mean.").

DAS does not attempt to explain the conflict between its claim construction position and the requirement that the Court construe the claims from the point of view of the knowledge in 1987.  At most, DAS accuses Bayer of relying on extrinsic evidence to make its point.  (D.I. 172 at 9).  But DAS is wrong even here.  The 1985 Don article using the term "2,4-D monooxygenase" is

---

[7] There is nothing fatal to Bayer's patent because the inventors did not have a complete scientific understanding of the way the enzyme worked in 1987.  It "is axiomatic that an inventor need not comprehend the scientific principles on which the practical effectiveness of his invention rests." *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1570 (Fed. Cir. 1983) (citing *Diamond Rubber Co. v. Consolidated Rubber Co.*, 220 U.S. 428, 435-36 (1911)).

[8] DAS *admitted* in its L. Pat. R. 3.2A non-infringement claim chart that people of ordinary skill in the art "thought" the genes were "monooxygenases" when Bayer filed its application, (Exh. C at 15), and *admitted nine times* in its L. Pat. R. 3.3 invalidity chart that the contemporaneous art referred to the gene in question as "a monooxygenase gene."  (*Id*. at 25, 27, 32).

cited directly in the specification of the '401 patent. (Exh. A at cover page and 1:45-47). The Federal Circuit has clarified that prior art cited during the prosecution of a patent is *intrinsic*, not extrinsic, evidence. *Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1231 (Fed. Cir. 2011). In fact, the *only* extrinsic evidence Bayer cites in support of its claim construction position reveals the interesting, but not necessarily material, fact that persons of skill in the art (such as scientists at Monsanto) continue to refer to the TfdA enzyme as a "2,4-D monooxygenase" even to this day. (D.I. 161, D.I. 177; D.I. 112 at 7 n.10).[9]

### III. DAS's Construction Excludes the Preferred Embodiment.

Perhaps the greatest flaw in DAS's claim construction position is that it excludes the exemplary embodiment of the invention described in the '401 patent. The Federal Circuit has made clear that a claim construction that excludes the preferred embodiment described in the patent specification is "rarely, if ever, correct." *See, e.g., MBO Labs., Inc., v.* 474 F.3d at 1333; *Vitronics Corp.,* 90 F.3d at 1583. DAS's expert, Bollinger, says flat out that "TfdA is a dioxygenase" and that it catalyzes a "dioxygenase reaction." (Bollinger Decl. ¶¶9b, 13). DAS argues that its AAD enzymes have a similar activity and are therefore also excluded from the '401 patent claims. (D.I. 172 at 18). It is therefore clear that DAS believes that the '401 patent claims cover *neither* the *tfdA* or the *aad* genes. (*See also* Exh. C at 3-4, where DAS contends that the specification "does not describe even a single species" of a 2,4-D monooxygenease).

This is not one of those "rare" cases where it would be correct to exclude the preferred embodiment from the claims. It is, of course, "unlikely that an inventor would define the invention in a way that excluded the preferred embodiment." *Hoechst Celanese Corp. v. BP Chemicals Ltd.*,

---

[9] DAS also suggests that the inventors' use of the term "2,4-D monooxygenase" was a "mistake." (D.I. 172 at 11, 18). But it could not have been a "mistake" to use the name of the enzyme commonly accepted at the time. DAS cites *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956 (Fed. Cir. 1983), which held a patent claim invalid for lack of utility because, due to a lack of understanding by the inventor, it claimed an impossible process. *Raytheon* is inapposite because DAS has never contended that the '401 patent claims an impossibility.

-7-

78 F.3d 1575, 1581 (Fed. Cir. 1996).  However, the Federal Circuit has on rare occasion permitted a construction that excludes a disclosed embodiment where the inventor made a clearly narrowing amendment to exclude an embodiment during patent prosecution, *North American Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335, 1346 (Fed. Cir. 2005), or deliberately chose to claim fewer than all of the disclosed embodiments of his invention, *Sinorgchem Co., v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138-39 (Fed. Cir. 2007).  But neither case applies here—DAS does not argue that Bayer made a "narrowing amendment" that excluded the *tfdA* gene and, as discussed below, no event in the prosecution history evinces a clear disclaimer of this subject matter.  The Federal Circuit has stated that the "rule" against excluding preferred embodiments "has particular force" against a construction that would not "encompass *any* disclosed embodiments." *Sinorgchem*, 511 F.3d at 1138-39 (emphasis added).  The "particular force" of the rule is triggered here because DAS's construction reads the disclosed embodiments completely out of the patent.

    **IV.**    **DAS's Construction Renders Dependent Claims Meaningless.**

DAS's construction violates yet another fundamental principle of patent law.  Under the patent statute, 35 U.S.C. §112, ¶4, a claim in dependent form is construed to incorporate by reference the limitations of the claim[s] on which it depends and must further limit those claims.  Put another way, there must be some overlap between the subject matter of the dependent claim and the independent claim[s] from which it depends.  *See Pfizer, Inc. v. Ranbaxy Labs., Ltd.*, 457 F.3d 1284, 1291-92 (Fed. Cir. 2006).  In this case, claim 4 of the '401 patent depends from claim 1 and recites, *inter alia*, "the structural gene sequence of FIG. 10."  (Exh. D at 1).  The specification identifies Figure 10 as showing the DNA sequence of a fragment "on which the tfda gene is transcribed."  (Exh. A at 10:55-59).  In other words, claim 4 further limits claim 1 by its express inclusion of the DNA sequence of the *tfda* gene.  But under DAS's construction, as discussed above, claim 1 *excludes* the *tfda* gene entirely and thus no overlap would exist between the subject

matter of claim 1 and claim 4.  The Court should not reach such a "nonsensical result."  *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1362-63 (Fed. Cir. 2008) (declining to adopt construction leading to the "nonsensical result" of not covering patentee's drug and rendering dependent claims "meaningless").

> V.  **Nothing in the Prosecution History Supports DAS's Construction or Contradicts Bayer's Construction.**

DAS believes that three aspects of the prosecution history undermine the inventors' clear definition of "biological activity of 2,4-D monooxygenase."  DAS points to: (1) references during the prosecution to "2,4-D monooxygenase gene" as a short-hand description of the invention; (2) Dr. Streber's declaration submitted to the PTO; and (3) the PTO examiner's restriction requirement.  (D.I. 172 at 14-16, 19-21).  None of DAS's arguments has merit.

***References to "2,4-D monooxygenase gene":***  DAS points to instances where Bayer referred to the "invention" as a "2,4-D monooxygenase gene."  This is not remarkable because, as discussed above, at the time, that is the name the art used for the gene and the enzyme in question.  All of the substantive events in the patent prosecution history (other than the PTO Board of Appeals' decision overturning the patent examiner's rejections) occurred prior to 1993, when the experts agree that it was first discovered that the TfdA enzyme could be characterized as a "dioxygenase."  Therefore, it makes no sense to read any of Bayer's statements as limiting the claimed invention to what DAS says is properly called a "monooxygenase" as distinguished from a "dioxygenase."  Such a distinction would have been impossible before 1993.

DAS argues that by referring to the "invention" as a "2,4-D monooxygenase" gene, Bayer "disclaimed" 2,4-D side chain cleaving enzymes that are dioxygenases.  (D.I. 172 at 19-20).  But a "prosecution disclaimer" occurs only where an event during the prosecution amounts to a "clear disavowal" or "contrary definition" to what is otherwise a clear meaning of a claim  limitation.  *See, e.g.*, *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent

-8-

a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language."); *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1335 (Fed. Cir. 2009) (limiting event must contain "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). Given the circumstances here, where the enzyme in question was called a "2,4-D monooxygenase" and it was not understood that it could be called a "dioxygenase," it is impossible to conclude that Bayer intentionally "disclaimed" a "dioxygenase" (which is what DAS calls its AAD enzymes) from the scope of the claims.

  ***The Streber Declaration:*** DAS argues that a declaration filed in 1992 by the lead inventor, Dr. Streber, "saved" Bayer's claims from being rejected for obviousness. (D.I. 172 at 14-15). In his declaration, DAS says that Streber "focused exclusively on what is non-obvious about a 2,4-D *monooxygenase gene* and enzyme." (D.I. at 15) (emphasis by DAS). DAS then quotes a passage from Streber's declaration that is badly ellipsized and urges the Court to infer that this passage means that "Bayer even distinguished its 2,4-D enzyme from prior art 2,4-D enzymes based on the difference between what 'factors' (*i.e.*, co-substrates) were present or absent in the plant cell as distinguished from an *E. coli* cell." (D.I. 172 at 15). By using the term "co-substrates," DAS urges the Court to infer that Streber was distinguishing a "monooxygenase" from a "dioxygenase."

  DAS's inference is impossible: *First*, when Dr. Streber signed his declaration on April 3, 1992, it had yet to be discovered that the enzyme described in the patent used a co-substrate and thus could also be called a "dioxygenase." The "factors" to which Streber was referring simply could not have been "co-substrates" (such as would distinguish a "monooxygenase" from a "dioxygenase") as DAS suggests.[10]

---

[10] DAS's inference that the "factors" in the declaration are "co-substrates" is also impossible from a scientific standpoint. As any first year biology student would have known, cells in virtually all living organisms, including plants, animals and bacteria, produce *both* NADH and α-ketoglutarate as part of the Krebs cycle (also called the citric acid cycle), which is the mechanism by which living cells produce energy from glucose using oxygen (also known as "respiration"). (Exh. G).

-9-

*Second*, DAS elides the central points made in the declaration. Here is an image of the declaration document with the language DAS quotes at page 15 of its brief highlighted in yellow; the omitted language appears between:

> In contrast, ==the present invention provides for the first time a 2,4-D monooxygenase gene and protein in plants, which do not normally possess such an activity. This enzyme posesses a highly unique biological activity==. There was no way to predict from this reference, either alone or in combination with the other cited reference, whether:
> 
> a) the bacterial 2,4-D monooxygenase could be expressed inside eukaryotic cells, e.g., plant cells, and
> 
> b) even if it were, if the biological activity of the 2,4-D monooxygenase would be retained, and,
> 
> c) even if it were, if it would be retained at a level compatible with both
>    i) the biological activity of herbicide-resistance and
>    ii) the viability of the plant.
> 
> In particular, at the time the invention was made, there were no references disclosing the identification of the biological activity of 2,4-D monooxygenase outside of living bacterial cells. ==In fact, the Amy et al. reference only shows the 2,4-D monooxygenase enzymatic activity in E. coli cells. It was not known whether there were additional factors present (or absent) inside bacterial cells the presence (or absence) of which were required for enzymatic activity.==

(Exh. I). Read in context, it is clear that Dr. Streber was pointing out that because it was not known whether there were differences between bacteria and plants that would prevent the enzyme isolated from bacteria from being effective in plants, those skilled in the art would not have been motivated to link a heterologous plant-expressible promoter to a bacterial structural gene in the manner suggested by the patent examiner in his rejection. This has nothing to do with any difference between a "monooxygenase" and a "dioxygenase."

**The Restriction Requirement:** DAS also fundamentally misconstrues the import of the PTO examiner's restriction requirement, which was made on April 8, 1991. (Exh E). Bayer's

---

Logically, NADH and α-ketoglutarate, which are *present* in *both* bacteria and plants, could not be "factors" the "presence (or absence)" of which could account for the uncertainty as to whether the enzyme would work in bacteria but possibly not in plants, as stated in Streber's declaration.

-10-

response was received by the PTO on September 9, 1991. (Exh. F). The notion that the restriction requirement reflected that either Bayer or the patent examiner understood a distinction between a "2,4-D monooxygenase" and a "2,4-D dioxygenase" is impossible because the distinction was unknown before 1993.

The examiner's differentiation in his restriction requirement between the "Group I" claims to a "2,4-D monooxygenase gene" and the "Group II" claims to "a mutant of a 2,4-D monooxygenase gene" obviously meant something else. That "something else" is apparent from the patent specification, which describes in Example 13 the creation of "tfdA mutants" (also called "2,4-D negative mutants" and "transposon mutants") that *lack* the biological activity of the TfdA enzyme. (Exh. A at 22:56 to 24:16). These mutant genes were considered a novel aspect of the invention and were originally claimed in the patent application in the "Group II claims." The mutants are useful inventions in and of themselves because the mutant genes can be inserted into bacteria which can be used as a screening tool to identify a gene that produces the 2,4-D degrading enzyme (*i.e.*, an enzyme that cleaves the side chain of 2,4-D) from any soil bacteria known to degrade 2,4-D.[11]

---

[11] The specification describes this process, called "conjugative transfer," in Example 14. (*See* Exh. A at 24:19 to 25:42). In particular, bacteria containing the 2,4-D mutant genes created in accordance with the procedures in Example 13 (*id.* at 24:49-59) are cultured with *E. coli* bacteria containing various pieces of DNA from known 2,4-D degrading soil bacteria (which DNA is obtained in processes described in Examples 1-7). The *E. coli*. "donate" DNA (which includes the 2,4-D degrading gene of interest) to the mutant bacteria in order to form a strain in which the 2,4-D degrading "wild-type property" is "restored." (*id.* at 25:14-17). The DNA fragment that restored the activity to the inactivated mutant bacteria must contain the active gene and its thus identified using this process. Original claim 44, which DAS quotes in its brief at p. 16, describes this process. Claim 44 claimed a method of preparing a polypeptide (*i.e.*, an enzyme) that has the biological activity of 2,4-D by culturing cells that contain DNA (original claims 25, 26) comprised of a mutant 2,4-D monooxygenase gene (original claim 10) in which the mutant gene was created by substituting, deleting or adding nucleic acids in the biologically active gene (original claim 1). (Exh. H at handwritten pp. 67-69).

Ultimately, Bayer did not pursue the claims to mutant 2,4-D monooxygenase genes for use as a screening tool. However, nothing in this choice can be construed to limit the claims that did issue in the patent—which are drawn to genes that encode an enzyme having "the biological activity of 2,4-D monooxygenase"—in the manner suggested by DAS. Whatever the consequence of Bayer's election not to pursue certain claims in response to the restriction requirement, it cannot in law or logic be a "clear disavowal" of claims to what DAS calls a "2,4-D dioxygenase" because the non-elected claims were never directed to a "2,4-D dioxygenase."

### VI.   DAS's Construction of "Polypeptide" is Also Wrong.

DAS violates yet a *fifth* canon of claim construction when it argues that the term "polypeptide" in claim 1 should be defined as "the amino acid sequence of the protein product of the tfda gene." (D.I. at 24). This is the classic error of reading limitations from the patent specification into the claim. *See, e.g.*, *Epistar*, 566 F.3d at 1337; *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."). It should not escape the Court's notice that, when it wants to construe "biological activity of 2,4-D monooxygenase," DAS wants to read the *tfdA* gene *completely out of* the claim, but when it construes "polypeptide," DAS wants to limit the claim *only* to the *tfdA* gene disclosed as the exemplary embodiment. To accept both of DAS's positions, the Court would have to conclude that claim 1 covers *nothing*!

As DAS tacitly acknowledges, "polypeptide" is well understood to refer to a chain of amino acids (which may comprise a protein, of which an enzyme is an example). DAS urges the Court to deviate from this common meaning because the '401 patent equates "the present invention" to DNA containing the *tfdA* gene. (D.I. 172 at 25). But patents commonly refer in short-hand to a preferred embodiment as "the present invention." This does not mean that the patent *claims* only the preferred embodiment. That is why the Court has to construe the claims. DAS's caselaw is unavailing. The common thread in each of the cases DAS cites at pp. 24-25 of

-12-

its brief is that the patent specification or prosecution history contained a "clear disavowal" of claim scope.[12] In this case, DAS points to nothing in the '401 patent specification that disavows genes other than the *tfdA* gene. To the contrary, the specification lists several bacteria known at the time to degrade 2,4-D that would produce a "2,4-D monooxygenase enzyme," the genes for which could be isolated using the teaching of the patent. (Exh. A at 1:21-40). That is why claim 1 is directed to "*a*" DNA sequence encoding a polypeptide.[13]

The *sixth* and final canon of claim construction that DAS violates is the doctrine of claim differentiation, which holds that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315. In this case, as discussed above, claim 4 includes a specific limitation to the *tfdA* gene. DAS provides nothing that would overcome the presumption that this limitation is therefore absent in claim 1.

## CONCLUSION

For all of the reasons stated herein and in Bayer's Opening Brief, Bayer respectfully submits the Court should streamline this case by granting partial summary judgment that DAS infringes claims 1-3 and 8 of the '401 patent.

---

[12] *See Epistar*, 566 F.3d at 1336 (explaining, *inter alia*, the holding of *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312 (Fed. Cir. 2006)); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008) (specification was limiting only to the extent it differentiated known prior art devices); *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003), (impermissible to limit claims "without other indicia that the patentee so intended to limit the invention"); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341-42 (Fed. Cir. 2001) (claims held not to cover what was "expressly distinguished"); *Watts v. XL Sys., Inc.*, 232 F.3d 877, 883-84 (Fed. Cir. 2000) (claims limited during prosecution by arguments differentiating over the prior art).

[13] "[A]n indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (quoting *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)).

|  |  |
|---|---|
| OF COUNSEL: | */s/ Travis S. Hunter* <br> Frederick L. Cottrell, III (#2555) <br> Jeffrey L. Moyer (#3309) |
| Robert J. Koch <br> Jay I. Alexander <br> Arie M. Michelsohn <br> MILBANK, TWEED, HADLEY <br>   & McCLOY, LLP <br> 1850 K Street NW, Suite 1100 <br> Washington, DC  20006 <br> (202) 835-7500 <br> rkoch@milbank.com <br> jalexander@milbank.com <br> amichelsohn@milbank.com | Anne Shea Gaza (#4093) <br> Travis S. Hunter (#5350) <br> Richards, Layton & Finger, P.A. <br> One Rodney Square <br> 920 North King Street <br> Wilmington, DE  19801 <br> (302) 651-7700 <br> cottrell@rlf.com <br> moyer@rlf.com <br> gaza@rlf.com <br> hunter@rlf.com |
| DATED:  February 9, 2012 | *Attorneys for Plaintiff* <br> *Bayer CropScience AG* |

-14-

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 9, 2012, I caused to be served copies of the foregoing document in the manner indicated below and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following counsel of record:

**VIA E-MAIL**
Steven J. Balick
Lauren E. Maguire
Andrew C. Mayo
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
lmaguire@ashby-geddes.com
amayo@ashby-geddes.com

**VIA E-MAIL**
Peter A. Bicks
Alex V. Chachkes
Joseph A. Sherinsky
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
212-506-3748
pbicks@orrick.com
achachkes@orrick.com
jsherinsky@orrick.com

Elizabeth A. Howard
ORRICK, HERINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
(650) 614-7400
ehoward@orrick.com

Hardip B. Passananti
ORRICK, HERINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA  92614
(949)567-6700
hpassananti@orrick.com

　　　　　　　　　　　　　　　　　*/s/ Travis S. Hunter*_____
　　　　　　　　　　　　　　　　　Travis S. Hunter (#5350)
　　　　　　　　　　　　　　　　　hunter@rlf.com