## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------X
: 
**BAYER CROPSCIENCE AG,**                    :
:
        **Plaintiff,**           :
:       **C.A. No. 10-1045-RMB-JS**
:
      **v.**                         :
:
:
**DOW AGROSCIENCES LLC,**                  :
:
        **Defendant.**          :
:
-----------------------------------------------------------------X

### BAYER CROPSCIENCE AG'S  OPENING MARKMAN BRIEF

OF COUNSEL:                        Frederick L. Cottrell, III (#2555)
                                   Jeffrey L. Moyer (#3309)
Robert J. Koch                     Anne Shea Gaza (#4093)
Jay I. Alexander                   Travis S. Hunter (#5350)
Arie M. Michelsohn                 Richards, Layton & Finger, P.A.
MILBANK, TWEED, HADLEY &           One Rodney Square
McCLOY LLP                         920 North King Street
1850 K Street NW, Suite 1100       Wilmington, DE 19801
Washington, DC  20006              (302) 651-7700
(202) 835-7500                     cottrell@rlf.com
rkoch@milbank.com                  moyer@rlf.com
jalexander@milbank.com             gaza@rlf.com
amichelsohn@milbank.com            hunter@rlf.com

                                   *Attorneys for Plaintiff*
Dated:  March 13, 2012             *Bayer CropScience AG*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... ii

A.      The Legal Standards for Construing Patent Claims ........................................ 3

B.      Disputed Terms Present in Claim 1 .................................................................. 5

        1.      "A DNA sequence encoding a polypeptide" ........................................ 6

        2.      "biological activity of 2,4-D monooxygenase" .................................. 10

        3.      "capable of being expressed in a plant" ............................................. 11

C.      Disputed Terms Present in Claim 2 ................................................................ 17

        1.      "a transgenic plant containing a recombinant gene" ......................... 17

D.      Disputed Terms Present in Claim 4 ................................................................ 20

        1.      "hybridizable therewith" .................................................................... 20

E.      Conclusion ..................................................................................................... 28

RLF1 5903968v. 1

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
   512 F.3d 1338 (Fed. Cir. 2008)............................................................................7

*Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*,
   55 F. Supp. 2d 1024 (N.D. Cal. 1999) ................................................................23

*Daiichi Pharm. Co. v. Apotex, Inc.*,
   No. 03-937 (WGB), 2006 WL 2065049 (D.N.J. July 21, 2006) ...............................5

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005)..........................................................................26

*Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*,
   34 F.3d 1048 (Fed. Cir. 1994)..............................................................................8

*Enzo Biochem, Inc. v. Applera Corp.*,
   599 F.3d 1325 (Fed. Cir. 2010), *cert. denied*, 131 S. Ct. 3020 (2011) ........................... *passim*

*Epistar Corp. v. Int'l Trade Comm'n*,
   566 F.3d 1321 (Fed. Cir. 2009).............................................................................4

*Exxon Research & Eng'g Co. v. United States*,
   265 F.3d 1371 (Fed. Cir. 2001)..............................................................25, 27, 28

*Hoechst Celanese Corp. v. BP Chems. Ltd.*,
   78 F.3d 1575 (Fed. Cir. 1996)..............................................................................5

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
   381 F.3d 1352 (Fed. Cir. 2004).............................................................................4

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
   802 F.2d 1367 (Fed. Cir. 1986)..........................................................................28

*Invitogen Corp. v. Biocrest Mfg., L.P.*,
   424 F.3d 1374 (Fed. Cir. 2005)..........................................................................25

*KCJ Corp. v. Kinetic Concepts, Inc.*,
   223 F.3d 1351 (Fed. Cir. 2000)........................................................................7, 8

*LadaTech, LLC v. Illumina, Inc.*,
   No. 09-627-SLR, 2012 WL 207937 (D. Del. Jan. 24, 2012).................................21

*Liebel–Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004)..............................................................................5

*Life Technologies Corp. v. Biosearch Technologies, Inc.*,
    No. 2:09-CV-283-TJW-CE, 2011 WL 4431854 (E.D. Tex. Sept. 22, 2011) ...................26, 27

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
    579 F.3d 1363 (Fed. Cir. 2009)........................................................................................4

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007)........................................................................................5

*Microprocessor Enhancement Corp. v. Texas Instruments Inc.*,
    520 F.3d 1367 (Fed. Cir. 2008)......................................................................................25

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*,
    403 F.3d 1364 (Fed. Cir. 2005)........................................................................................5

*Oxford Gene Technology Ltd. v. Mergen Ltd.*,
    No. 02-1695-KAJ, 2004 WL 2211971 (D. Del. Sept. 29, 2004) ...........................................27

*PC Connector Solutions LLC v. SmartDisk Corp.*,
    406 F.3d 1359 (Fed. Cir. 2005)........................................................................................5

*Pfizer, Inc. v. Ranbaxy Labs. Ltd.*,
    457 F.3d 1284 (Fed. Cir. 2006)........................................................................................5

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)............................................................................ *passim*

*Powell v. Home Depot U.S.A., Inc.*,
    663 F.3d 1221 (Fed. Cir. 2011)......................................................................................22

*RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*,
    326 F.3d 1255 (Fed. Cir. 2003)........................................................................................5

*Schering Corp. v. Amgen Inc.*,
    18 F. Supp. 2d 372 (D. Del. 1998).................................................................................27

*Spectra–Physics, Inc. v. Coherent, Inc.*,
    827 F.2d 1524 (Fed. Cir. 1987)......................................................................................24

*Stumbo v. Eastman Outdoors, Inc.*,
    508 F.3d 1358 (Fed. Cir. 2007)......................................................................................18

*Superguide Corp. v. DirecTV Enters., Inc.*,
    358 F.3d 870 (Fed. Cir. 2004).........................................................................................4

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996).....................................................................................4, 5

*Xerox Corp. v. 3Com Corp.*,
    267 F.3d 1361 (Fed. Cir. 2001)......................................................................................18

RLF1 5903968v. 1

**STATUTES & RULES**

35 U.S.C. §112...................................................................................................................5

**OTHER AUTHORITIES**

American Heritage Dictionary, Second College Edition, 1985.................................11, 24

Dictionary of Genetics (7th ed. 2006)..........................................................................25

Dictionary of Plant Genetics and Molecular Biology (1998).........................................25

Merriam Webster Dictionary (Online Version, 2011)....................................................7

MPEP §608.01(m) (5th ed. Rev. 10, Jan. 1989)...........................................................12

Oxford Dictionary of Biochemisty and Molecular Biology (2000)..................................6

Webster's New World Dictionary of the American Language (2d College ed., 1982)..................7

RLF1 5903968v. 1

Weeds are the bane of farmers everywhere.  In the recent past, farmers dealt with weeds by using multiple herbicide applications under carefully controlled conditions to maximize the effects of the herbicide on weeds while minimizing the effects on the desired cash crop, such as corn, soybeans or cotton.  Such techniques were decidedly expensive and unfriendly to the environment.  If cash crops could be "immunized" against the effects of herbicides, they could be used much more efficiently and effectively with crops, and farmers could reduce their use of chemicals and their time in applying them, saving money and doing less harm to the environment.

In the 1980s, scientists began exploring the possibility of manipulating plant genetics to enable crop plants to manufacture certain enzymes (also called proteins or "polypeptides") that would protect them from certain herbicides.  The inventors of the '401 patent-in-suit were some of the early pioneers in this work.   One widely used herbicide at the time was 2,4-dichlorophenoxyacetic acid ("2,4-D").  It was known that certain species of bacteria that live in the soil survived applications of 2,4-D and even metabolized it as food.  These bacteria contain genes that produce enzymes that degrade 2,4-D into other chemical byproducts, such as 2,4-dichlorophenol ("2,4-DCP").  In the mid-1980s, one of these enzymes, which catalyzes the first step in the degradation of 2,4-D in several species of soil bacteria, was called "2,4-D monooxygenase" because the chemical reaction caused by this enzyme—cleaving the "side chain" structure of 2,4-D from its main "ring" structure to form 2,4-DCP—was seen as similar to chemical reactions caused by other enzymes that were classified as "monooxygenases." (Hausinger Decl. ¶¶14-18).[1]

Techniques were also being developed at the time to transfer genes from bacteria into plant cells.  What was not known, however, was how to isolate the particular genes that produce the

---

[1] This brief is accompanied by declarations from Bayer's experts, Dr. Robert Hausinger, Dr. Alan Jones and Dr. Anne Matthysse.  Exhibits cited in this brief are those attached to the Declaration of Edward J. Mayle.

enzymes that break down 2,4-D into 2,4-DCP.  Nor had anyone previously suggested combining such genes with "plant-expressible promoter" sequences—DNA sequences that drive the expression[2] of such structural genes in plants.  It also was not known whether or not, if transferred into plants, such genes would produce enzymes that would both not harm the plant and protect the plant from 2,4-D.  (Jones Decl. ¶¶ 7-9).

The '401 patent[3] inventors isolated an exemplary 2,4-D resistance gene, called *tfdA*, from a species of bacteria at that time called *Alcaligenes eutrophus*.  The inventors did this by creating mutant strains of bacteria in which the 2,4-D degrading function had been disabled, and by employing particular strains of bacteria that lacked a 2,4-D degrading function to begin with.  These bacterial strains can be used as a tool to identify (that is, "screen for") the DNA sequences (*i.e.*, the genes) responsible for the 2,4-D degrading enzymes in any species of bacteria known to degrade 2,4-D into 2,4-DCP.  (Jones Decl. ¶¶10-12).  The inventors were the first to predict, and then later demonstrate, that a gene encoding such a 2,4-D degrading enzyme could be combined with a plant-expressible promoter sequence and thus be rendered capable of expression in a plant, as well as actually confer 2,4-D resistance without harming the plant, when genetically engineered into plants.

Claims 1 and 4-10 of the '401 patent are the "recombinant gene claims."  Claim 1—the only independent claim in the patent—recites a recombinant gene comprised of two DNA sequences:  (1) a DNA sequence that encodes "a polypeptide having the biological activity of 2,4-D monooxygenase"; and (2) a DNA sequence known as a "heterologous promoter," which is capable of promoting the expression in a plant of the DNA coding sequences to which it is linked.

---

[2] "Expression" is the process by which the coding information embodied by a gene (the DNA sequence) is used by the cell of a living organism to produce a protein (or polypeptide).  (Jones Decl. ¶¶12-14).

[3] The '401 patent is attached as Exhibit "A" to the Declaration of Edward J. Mayle.

The coding DNA sequence of claim 1 (*i.e.*, "the structural gene sequence")[4] is "capable of being expressed in a plant" because the second DNA sequence—that of the heterologous promoter—is known to be capable of promoting expression of structural DNA in a plant.  Claim 4 limits claim 1 by specifically reciting the exemplary *tfdA* gene isolated by the inventors and described in the patent, as well as DNA sequences that can "hybridize" with *tfdA*.  The other gene claims are directed to specific vectors and plasmids containing a recombinant gene of claim 1.

Claims 2-3 are the "transgenic plant claims," which are directed to "transgenic plants" containing the recombinant gene of claim 1.  Claim 11 ("the transformed bacteria claim") is directed to a bacterial strain transformed with a vector containing a recombinant gene of claim 1.  The "method claims" 12 and 14-16 recite methods of preparing a polypeptide having the biological activity of 2,4-D monooxygenase.  Claim 13 is directed to a "transgenic microorganism or plant" having cells transformed with a vector containing a recombinant gene of claim 1.

The majority of the parties' claim construction disputes relate to limitations in gene claim 1 and will be treated together.  Another dispute relates to plant claim 2 and the final dispute, relating to the "hybridizable" limitation in gene claim 4, merits separate attention.

**A.     The Legal Standards for Construing Patent Claims**.

The Federal Circuit has set forth a number of claim construction canons, many of which are relevant here:

1.     The court construes patent claims from the standpoint of one of ordinary skill in the relevant art primarily in light of the "intrinsic evidence":  the claim language itself, the remaining parts of the specification, and the prosecution history, including the prior art cited in the patent and during prosecution.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-14 (Fed. Cir. 2005) (*en banc*).

---

[4] The parties have stipulated that the phrase "structural gene sequence" as used in the patent claims means "a DNA sequence that encodes a polypeptide."

The patent specification is "always highly relevant to the claim construction analysis" and is "the single best guide to the meaning of a disputed term." *Id.* at 1315.

2.      Where a patentee has acted "as his own lexicographer" by expressly defining a claim term in the specification, that definition "controls the meaning of [the term] regardless of any potential conflict with the term's ordinary meaning as reflected in technical dictionaries." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

3.      While the patent specification is critical to the understanding of the claim terms, it is impermissible to limit the claims only to the specific embodiments described. *Phillips*, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1337 (Fed. Cir. 2009); *Superguide Corp. v. DirecTV Enters., Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004) (preferred or exemplified embodiments "may not be read into a claim when the claim language is broader than the embodiment").

4.      An event occurring in the patent prosecution history can lead to a construction of a claim limitation at variance with otherwise clear claim language only where the event evidences a clear, intentional disavowal of claim scope. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language."); *Epistar*, 566 F.3d at 1335 (limiting event must contain "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope").

5.      The court must construe terms used in patent claims as one of "skill in the art at the time of the invention" would understand them. *Phillips*, 415 F.3d at 1313. Where the art's usage of a term has changed over time, the meaning understood at the time of the patent filing is what is

relevant. *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) ("A claim cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date."); *Daiichi Pharm. Co. v. Apotex, Inc.*, No. 03-937 (WGB) 2006 WL 2065049, at *2 (D.N.J. July 21, 2006) (rejecting reliance on later-published dictionary definitions because the dictionary in question "does not provide accurate definitions as they were known at the time the patent was filed and, therefore, has no place in this suit").

6.     The patentee is presumed to have intended to claim the preferred embodiment disclosed in the patent specification. *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996). A claim construction that excludes the preferred embodiment described in the patent specification is "rarely, if ever, correct." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007); *Vitronics*, 90 F.3d at 1583.

7.     A dependent claim must have some overlapping subject matter with the claim(s) on which it depends. *Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1291-92 (Fed. Cir. 2006); 35 U.S.C. §112, ¶4. Moreover, "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Phillips*, 415 F.3d at 1315; *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("As this court has frequently stated, the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim."); *RF Delaware, Inc. v. Pacific Keystone Techs., Inc.*, 326 F.3d 1255, 1263 (Fed. Cir. 2003); *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005).

**B.     Disputed Terms Present in Claim 1.**

Claim 1 is reproduced below, with the disputed claim limitations highlighted in yellow:

1. A recombinant gene, comprising

a DNA sequence encoding a polypeptide having the biological activity of 2,4-D monooxygenase which is capable of being expressed in a plant, operably linked to

a heterologous promoter capable of promoting the expression in a plant of a structural gene operably linked thereto.

It is important that the Court bear in mind that, although the parties may, at times, focus their discussion on the meanings of specific words, what is at issue are claim **limitations**, which are embodied in the **entire phrases** in which the specific terms are used.  It is the **claim limitations** that the Court is being asked to construe.

### 1.   "A DNA sequence encoding a polypeptide"

The parties' respective positions on this claim limitation are as follows:

| Claim Limitation | Bayer Proposed Construction | DAS Proposed Construction |
|---|---|---|
| a DNA sequence encoding a polypeptide (claim 1) | "a DNA sequence encoding a polypeptide" :  a DNA sequence encoding a chain of amino acids | "a polypeptide" :  the amino acid sequence of the protein product of the *tfdA* gene |

"A DNA sequence encoding a polypeptide" means, simply, "a DNA sequence encoding a chain of amino acids."  DAS has not contested that "DNA sequence" has its plain meaning to one of ordinary skill in the art (*i.e.*, a sequence including the four different nucleotide building blocks that make up DNA, designated as A, G, T, & C).  *See, e.g.*, Oxford Dictionary of Biochemisty and Molecular Biology (2000) (Exh. "B"); *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1327 (Fed. Cir. 2010) (explaining the basic structure of DNA), *cert. denied*, 131 S. Ct. 3020 (2011).

The Court should likewise give the term "polypeptide" its plain meaning to the ordinary artisan; *i.e.*, "a molecular chain of amino acids."  Amino acids are the building blocks of all

polypeptides (including proteins)).  *See* Merriam Webster Dictionary (Online Version, 2011) (Exh. "C"); (Jones Decl. ¶ 16).  The term "polypeptide" is found in practically every high school biology textbook and its long-standing meaning has not changed since the German priority application to the '401 patent was filed on August 29, 1986.  *See* Webster's New World Dictionary of the American Language (2d College ed., 1982) (defining "polypeptide" as "a substance containing two or more amino acids in the molecule joined together by peptide linkages"). (Exh. "D"); (Jones Decl. ¶ 16).

DAS unreasonably attempts to limit the term "a polypeptide" *only* to the exemplary TfdA enzyme characterized in detail in the specification.  DAS's position is directly contrary to the black letter Federal Circuit case law that generally prohibits limiting claims only to the preferred embodiment described in the patent specification.  (*See* canon 3, *supra*).  Nothing in the plain language of the claims, the specification or the patent prosecution history provides a basis for limiting the phrase "A DNA sequence encoding a polypeptide" to anything other than its ordinary meaning to one skilled in the art.

***The Claim Language:***  The plain language of claim 1 makes clear that the phrase "[a] DNA sequence encoding a polypeptide" is *not* limited to one specific DNA sequence or to one specific polypeptide.  Rather, the claim limitation plainly is met by "*a* DNA sequence encoding *a* polypeptide" having the requisite "biological activity of 2,4-D monooxygenase."  The Federal Circuit has made clear "that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'"  *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008) (*quoting KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)).  The Court further has emphasized that "exceptions to this rule are extremely limited:  a patentee must 'evince[ ] a clear intent' to limit 'a' or 'an' to 'one,'" *id.,* and that "standing alone, a disclosure of a preferred or exemplary

embodiment encompassing a singular element does not disclaim a plural embodiment." *KCJ Corp.*, 223 F.3d at 1356; *see also Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("[A]lthough the specifications  may well indicate that certain embodiments are preferred, particular embodiments appearing in a specification will not be read into the claims when the claim language is broader than such embodiments.").

Claim 1 is a "comprising"  claim; and the intrinsic evidence does not evince a clear intent to limit "a" or "an" to "one."  To the contrary, as discussed, the plain language of the claim, the specification, and the prosecution history all show consistently that the indefinite article "a" in the phrase "[a] DNA sequence encoding a polypeptide" refers to any DNA sequence that encodes a polypeptide having the requisite "biological activity of 2,4-D monooxygenase."

*The Specification:*   The '401 specification makes clear at the outset that enzymes that degrade 2,4-D may be found in many bacteria known to survive in the presence of 2,4-D:

> 2,4-D-Monooxygenase is an enzyme catalyzing in *many* 2,4-D-degrading organisms the first step in the metabolizing of [2,4-D].  Among the 2,4-D degrading organisms belong, in particular, soil bacteria, such as, for example, Acinetobacter, Alcaligenes, Arthrobacter, Cyronebacterium and Pseudomonas.

(Exh. "A" at col. 1, ll. 21-26) (emphasis added).  The claimed DNA sequences encoding polypeptides having the "biological activity of 2,4-D monooxygenase" thus include DNA sequences, and corresponding polypeptides, from multiple sources, not just one.

Moreover, the specification teaches that the claimed DNA sequences refer not only to the exemplary *tfdA* gene isolated from the particular bacterial strain of *Alcaligenes eutrophus* used by the inventors (denoted "JMP134"), but also to any homologs encoding proteins having comparable biological activity.  (Exh. "A" at col. 2, l. 63 to col. 3, l. 2 (pointing out as an aspect of the invention genes hybridizing to tfdA "and coding for a protein which has the biological activity of the protein encoded by tfda, [i.e.,] its 2,4-D-monooxygenase activity"); col. 6, l. 62 to col. 7, l. 10 ("By means of the conventional hybridization method, fragments can be identified . . . in a gene

bank . . . which fragments exhibit homology with tfda.  In this way, it is possible to recognize even among a population of various organisms those which contain such a tfda-homologous sequence.")).

In addition, the specification also describes in detail specific assays, using bacterial strains lacking a 2,4-D degrading function, for isolating not just the exemplary *tfdA* gene from *Alcaligenes eutrophus*, but any DNA sequence that encodes a polypeptide having a comparable biological (enzymatic) activity of cleaving the side chain of 2,4-D to form the corresponding phenol, 2,4-DCP.  (Jones Decl. ¶¶10-13).  (*See* Exh. "A" at col. 3, ll. 11-36; cols. 24-25 (Example 14), *esp*. col. 25, ll. 14-23).[5]  Taken together, these passages from the specification indicate clearly that the inventors did not intend to limit their claims only to the single *tfdA* gene that they characterized in detail.

**The Prosecution History:**  The prosecution history of the '401 patent further supports Bayer's construction.  In rebutting the patent examiner's non-enablement rejection, the inventors argued that "the disclosure provides ample enablement for isolation of 2,4-D monooxygenase from a *large number of sources* and by several methods."  (Exh. "E" at 4 (emphasis added)).  The PTO Board of Patent Appeals, which ultimately reversed the examiner's rejection, determined that the examiner had cited no evidence to the contrary.  (Exh. "F" at 3-4).

---

[5] Such mutant bacteria described in the specification *lack* a functional enzyme polypeptide having the biological activity of cleaving the side chain of 2,4-D to form 2,4-DCP.  (*See* Exh. "A" at col. 2, ll. 21-40).  When these mutant bacteria are transformed with a foreign DNA sequence encoding a polypeptide having the biological activity of cleaving the side chain of 2,4-D to form 2,4-DCP, they acquire the ability to grow on 2,4-D (which means the bacteria are digesting 2,4-D by cleaving the side chain).  Using these mutants, DNA sequences thus can be readily identified and isolated from *any* soil bacteria having an enzymatic activity that cleaves the side chain of 2,4-D to form 2,4-DCP.  (Jones Decl. ¶ 12).

-9-

Given the intrinsic evidence cited above, the Court should adopt Bayer's definition and reject DAS's definition, which improperly attempts to limit the claim only to the specific TfdA polypeptide described in the '401 patent.

### 2. "biological activity of 2,4-D monooxygenase"

The parties' respective positions on this claim limitation are as follows:

| Claim Limitation | Bayer Proposed Construction | DAS Proposed Construction |
| --- | --- | --- |
| 2,4-D monooxygenase (claim 1) | a polypeptide having the biological activity of bringing about the cleavage of the side chain of 2,4-D | an enzyme that reacts with the two atoms of molecular oxygen to add one to 2,4-D and reduces the other to water |
| biological activity of 2,4-D monooxygenase (claim 1) | the biochemical (enzymatic) conversion of 2,4-D into 2,4-DCP through the cleavage of the side chain of 2,4-D | the biochemical reactions that occur, and the reaction products that form, in a biological system in the presence of a 2,4-D monooxygenase enzyme and 2,4-D |

The parties' dispute over the meaning of the claim limitation "biological activity of 2,4-D monooxygenase" has been treated exhaustively in the multiple briefs filed in connection with Bayer's motion for partial summary judgment of infringement of claims 1-3 and 8. (D.I. 111-115, 188-189, 192). Bayer incorporates by reference all of the claim construction arguments it has made in its summary judgment briefs.[6]

Bayer notes that during the parties' exchange of proposed claim term definitions under the Court's Scheduling Order, DAS has attempted to separate the definition of the term "2,4-D monooxygenase" from the *claim limitation at issue*, which is embodied in the entire phrase: "the biological activity of 2,4-D monooxygenase." The entire phrase must be viewed as a whole. By urging a separate analysis, DAS attempts to (1) distract the Court from the express definition of the phrase "biological activity of 2,4-D monooxygenase" used by the '401 patent inventors in the

---

[6] Relevant sections of the briefs filed by Bayer are attached hereto as Exhibits "G", "H", and "I", respectively, for the Court's convenience.

specification (at col. 2, ll. 25-27 and 66-67), which defines this activity as cleavage of the side chain of 2,4-D; and (2) lead the Court to construe "2,4-D monooxygenase" in a way that is inconsistent with the usage of that term in the art at the relevant time and in a way that would exclude the exemplary *tfdA* gene disclosed in the patent.  For all of the reasons expressed in Bayer's summary judgment briefs, DAS's reading is legally flawed and should be rejected in favor of Bayer's position.

### 3.   "capable of being expressed in a plant"

The parties' respective positions on this claim limitation are as follows:

| Claim Limitation | Bayer Proposed Construction | DAS Proposed Construction |
| --- | --- | --- |
| capable of being expressed in a plant (claim 1) | the DNA sequence (recited in claim 1) is operably linked to a plant-expressible promoter | the expression in a plant of an enzymatically active protein at a level that provides resistance to 2,4-D herbicide |

The phrase "capable of being expressed in a plant" means that "the DNA sequence (recited in claim 1) is *operably linked to a plant-expressible promoter*" because the "operable link" to the promoter is what enables the DNA sequence to be expressed in a plant.  The intrinsic evidence supports Bayer's definition:

*The Claim Language:*  The phrase "capable of being expressed in a plant" has a plain, ordinary meaning.  The word "capable" means, in plain English, "having capacity or ability." (Exh. "J", The American Heritage Dictionary, Second College Edition, 1985).  The term "express" when used in connection with a gene or DNA sequence, is well understood in the biological arts. (*See* note 2, *supra*).  Moreover, one of ordinary skill in the art knows that the mechanism by which a DNA sequence, or gene, is expressed in a plant is by virtue of the linkage between the DNA sequence containing the gene of interest and another DNA sequence known as a "promoter" which operates to promote the expression of that gene in a plant—*i.e.*, a "plant-expressible" promoter.

-11-

(Jones Decl. ¶¶16-22).  The nature of such promoters and their ability to promote expression of structural genes in a variety of plants was well-understood in the art at the time the '401 patent was filed.  (Jones Decl. ¶¶20-22).[7]

The foregoing meaning is reflected in the parallel structure of the claim language, which uses the phrase "capable of being expressed in a plant" to describe the DNA sequence containing the gene of interest which encodes the polypeptide (highlighted in red) and the complementary phrase "capable of promoting the expression in a plant" to describe the "heterologous promoter" DNA (highlighted in green):

> 1. A recombinant gene, comprising
>    a DNA sequence encoding a polypeptide having the
>    biological activity of 2,4-D monooxygenase which is
>    capable of being expressed in a plant, operably linked
>    to
>    a heterologous promoter capable of promoting the expres-
>    sion in a plant of a structural gene operably linked
>    thereto.

(Exh. "A" at col. 32, ll. 12-20).

In fact, the very formatting of the claim supports Bayer's construction.  As can be seen, the claim is directed to two DNA sequences.  The first part of the body of the claim is a sub-paragraph directed to "**a DNA sequence encoding a polypeptide**."  That DNA sequence is deliberately set off from the limitations in a second sub-paragraph, which is directed to "**a heterologous promoter**."  This accords with standard patent practice, under which separate sub-paragraphs may be used to delineate boundaries between different elements in the claim.  *See* M.P.E.P. §608.01(m)

---

[7] However, the notion of combining a plant-expressible promoter with a structural gene having the "biological activity of 2,4-D monooxygenase" was neither taught nor suggested by the prior art. (*See* Exh. "K" at 2-3; Exh. "L" at 5-6).

(5th ed., Rev. 10, Jan. 1989) ("A claim may be typed with the various elements subdivided in paragraph form.  There may be plural indentations to further segregate subcombinations …") (Exh. "M").[8]  This claim structure is illustrated in Fig. 11, as annotated to show the "DNA sequence encoding a polypeptide" in red and the "heterologous promoter" sequence in green:



*The Specification:*  Consistent with the linguistic structure and formatting of the claim, the patent specification states that "[i]n order for a prokaryotic gene, such as tfdA, to be expressed in plant cells, it must be coupled with the plant-specific signal sequences necessary for transcription and translation.  *See* Example 17." (Exh. "A" at col. 8, ll. 14-18).  Example 17 shows the fusion of the TfdA-coding DNA sequence (denoted "DPAM") to either "the cauliflower mosaic virus (CMV) 35S promoter" or "the light-inducible promoter of gene ST-LS1."  The 35S promoter is a so-called "constitutive promoter" that by 1985 was well-known in the art to be capable of promoting, by its mere presence, the expression of structural genes in plants.  The ST-LS1 promoter is a so-called "light-inducible" promoter, which operates to promote gene expression in

_____

[8] The separate formatting can be seen in the original amendment submitted to the PTO adding patent application claim 45, which became claim 1 of the '401 patent.  (Exh. "E" at 2).

the presence of light.  (Exh. "A" at col. 29, l. 60 to col. 30, l. 18); (Jones Decl. ¶¶ 19-20); (*see also* Exh. "A" at col. 8, ll. 56-64:  "a plant/bacterial hybrid gene for 2,4-dichlorophenoxyacetic acid monooxygenase (DPAM) can be constructed and inserted into various plasmids in order to effect transfer and expression of the gene in plants.  The flanking sequences to the bacterial gene, both 5' and 3', may be engineered by means known in the art for making the hybrid gene capable of expression in the plant. For example, constitutive or inducible promoters may be inserted at the 5'-end of the gene.").

*The Prosecution History:*  The PTO Board of Patent Appeals understood the claim in exactly the same way as proposed here by Bayer.  In reversing the examiner's rejections, the Board characterized patent application claim 45 (which was renumbered to claim 1 when the patent issued) as follows:

> Claim 45 is directed to a recombinant gene which comprises two DNA sequences. The first DNA sequence encodes a polypeptide having the biological activity of 2,4-D monooxygenase which is capable of being expressed in a plant. The second DNA sequence is a heterologous promoter capable of promoting the expression in a plant of a structural gene operably linked thereto. According to claim 45, the two DNA sequences are to be "operably linked."

(Exh. "F" at 4) (colors added for emphasis)).  Not surprisingly, the Board's understanding was consistent with the way the inventors characterized their claims during patent prosecution:

> The newly added claims 45-50 generally correspond to old claims 8-9, except that the claims are now all directed to recombinant genes and vectors containing them, which in turn contain DNA sequences coding for a gene which is operably linked to a promoter which is heterologous to the gene, capable of expressing a polypeptide having the biological activity of 2,4-D monooxygenase in a plant cell. Claim 46 is

(Exh. "G" at 4 (colors added for emphasis)).  In its appeal brief to the Board, Bayer included a "Summary of the Invention" which unequivocally distinguished the "gene claims" from the "plant claims," and further distinguished each of those types of claims from the "bacteria claims." Bayer used semicolons (as opposed to commas) to clearly differentiate the various types of claims:

> **Summary of the Invention**
>
> The invention is directed to a recombinant gene, comprising a DNA sequence encoding a polypeptide having the biological activity of 2,4-D monooxygenase which is capable of being expressed in a plant, operably linked to a heterologous promoter capable of promoting the expression in a plant of a structural gene operably linked thereto (page 4, lines 24-31); a recombinant vector comprising said recombinant gene (page 4, lines 24-31); bacterial strains transformed with said vectors (page 4, lines 32-36); transgenic plants comprising said recombinant genes (page 5, lines 1-4) and methods of preparing polypeptides comprising expressing said genes (page 4, lines 32-36).

(Exh. "L" at 1-2).

As can be seen from the intrinsic evidence discussed above, the phrase "capable of being expressed in a plant" does not require that the claimed DNA sequence actually be expressed in a plant—but merely that it be operably linked to a heterologous promoter *capable of promoting expression* in a plant.  (Jones Decl. ¶¶ 24-29).  Thus, nothing in the claim language or the intrinsic evidence requires the actual presence of a transgenic plant or that the gene actually be expressed in the plant, much less to a minimum level.  For this reason, DAS's construction, which requires "expression in a plant of an enzymatically active protein at a level that provides resistance to 2,4-D herbicide" is fatally flawed.  DAS's attempt to freight the plain claim language—which is directed only to a "recombinant gene" comprised of two DNA sequences operably linked together—with additional  functional limitations, *i.e.*, that there be actual expression of an enzyme in a plant to a

minimum level that would confer resistance to 2,4-D resistance should be rejected.  These additional limitations are simply not stated in the claim language and are inconsistent with the specification and prosecution history.  *See Phillips*, 415 F.3d at 1312 ("It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'").  *See* claim construction canon 3, *supra*.

Moreover, DAS violates claim construction canon 7, *supra* (the doctrine of "claim differentiation") by attempting to import into claim 1 limitations that are contained in other, dependent claims.  For example, plant claims 2-3 are directed to "transgenic plants" containing the recombinant gene of claim 1.  If DAS were correct that "capable of being expressed in a plant" means actual expression in a plant to a minimum level sufficient to confer resistance to 2,4-D, claims 2-3 would be superfluous because the limitations contained in those claims (that the plant be transgenic in the case of claim 2 and that the recombinant gene of claim 1 be operably incorporated into the genome of the plant in the case of claim 3) inherently would be subsumed in DAS's definition of claim 1.  (Jones Decl. ¶ 28).

DAS's definition also violates the claim differentiation doctrine because claim 11 is directed to *microorganisms* (*i.e.*, a bacterial strain) that contains the gene of claim 1.  Claim 11 covers, for example, the gene in *E. coli* or other bacteria that is used during the "cloning" process, *e.g.*, the process of linking the gene with plant promoter in a self-replicating plasmid for further use.  This embodiment is described *e.g.*, in Example 17, which describes generation of plasmids pMCJC1007 and pMLJC1005, each containing the gene linked to a plant promoter.  (Exh. "A" at col. 30, 11. 1-18).   As another example, claim 11 covers the gene in the *Agrobacterium tumefacians* bacteria that are used to make a transgenic plant as described in Example 19 (Exh. "A" at col. 30, 11. 38-51).  The gene of claim 1 first must be transferred from the *E. coli* (described

in Example 17), to *Agrobacterium*, which is then used to infect the plant.  Once the *Agrobacterium* is in the plant, the gene is able to insert itself into the plant genome.

However, in either case, the gene is not expressed in either the *E. coli* or the *Agrobacterium*, much less to a level sufficient to confer resistance to 2,4-D.  Rather, the *E. coli* is merely a vessel used to transfer the gene to the *Agrobacterium*, and the *Agrobacterium* is a vessel to transfer the gene to a plant.  (Jones Decl. ¶ 21).  DAS's interpretation, which requires actual expression in a plant, would be nonsensical if applied to claim 11.  This further demonstrates the flaw in DAS's analysis.

### C.      Disputed Terms Present in Claim 2.

#### 1.      <u>"a transgenic plant containing a recombinant gene"</u>

The parties' respective positions on this claim limitation are as follows:

| Claim Limitation | Bayer Proposed Construction | DAS Proposed Construction |
|---|---|---|
| a transgenic plant containing a recombinant gene (claim 2) | a plant containing a man-made gene formed by combining DNA sequences | a plant that has been stably transformed with the recombinant gene |

The phrase "a transgenic plant containing a recombinant gene" as used in claim 2 means simply "a plant containing a man-made gene formed by combining DNA sequences."  DAS once again attempts to import an additional limitation into the claim that is not supported by the claim language, *i.e.*, that the plant be "stably transformed."  The fundamental flaw in DAS's definition is that stable transformation is claimed in claim 3 which requires the recombinant gene in the transgenic plant to be "operably incorporated into the genome."  DAS's construction would render claim 3 superfluous.  DAS thus again ignores the plain language of the claims and violates the Federal Circuit's black letter rules of claim construction.

***The Claim Language:***   As can be seen, the claim limitation in issue requires simply that the "transgenic plant" contain "a recombinant gene of claim 1."   Nothing in these words requires that the plant be "stably transformed" with such a gene, as DAS insists.   That limitation is contained in claim 3, which depends from claim 2 and contains the additional limitation that the DNA sequence "is operably incorporated into the genome of the host plant cell."   The Federal Circuit's doctrine of claim differentiation (*see* canon 7) holds that each claim in a patent is presumptively different in scope, such that a claim in issue should not be construed as requiring a limitation added by another claim that depends on the claim in issue.   Indeed, the only substantive difference between claim 2 and claim 3 is the additional phrase "operably incorporated in the genome" present in claim 3.   Thus, if as DAS urges, "a transgenic plant containing the recombinant gene" in claim 2 is interpreted to require that the recombinant gene is also stably incorporated in the genome of the plant, then claim 3 would be rendered superfluous, in violation of the Federal Circuit's law.   *See also Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1362 (Fed. Cir. 2007) (denouncing claim constructions which render phrases in claims superfluous); *Xerox Corp. v. 3Com Corp.*, 267 F.3d 1361, 1366 (Fed. Cir. 2001) (stating that reading a limitation into a claim that would render claims superfluous "will not do"); *Phillips*, 415 F.3d at 1315 ("the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

***The Specification:***   Bayer's construction is amply supported by the '401 patent specification, which backstops the notion that a "transgenic plant" containing a "recombinant gene" means simply that the plant is man-made.   For example, the first sentence of the patent specification states:   "The present invention relates to the production, by genetic engineering, of plasmids and bacterial strains containing the gene tfdA, or a gene essentially identical to tfda, ..." (Exh. "A" at col. 1, 11. 10-13).   The specification discloses that such human intervention enables

-18-

"the creation of transgenic organisms, preferably microorganisms and plants, which are resistant to the growth inhibiting effects of certain substituted or unsubstituted phenoxyacetic acids [which include 2,4-D]."  (*Id.* at col. 3, ll. 7-10) and "[t]ransgenic plants constructed according to these procedures can be grown in the presence of concentrations of certain substituted phenoxyacetic acids which are normally growth-inhibiting for untransformed plants."  (*Id.* at col. 9, ll. 13-16).

The '401 patent also discloses transgenic plants that contain a recombinant gene that is ***not*** "stably incorporated" into the genome.  It incorporates by reference, *inter alia*, an article that describes use of the Cauliflower Mosiac Virus (CaMV) as a vector for transforming plants.  N. Brisson and T. Hohn, Plant Virus Vectors: Cauliflower Mosaic Virus, in S. P. Colowick and N. O. Kaplan (ed.), *Methods in Enzymology*, 118 : 659 (1986) (referenced at col. 8, ll. 40-42).  This article explains that viral vectors, such as the CaMV, express recombinant genes in the viral genome under the control of viral promoter, and neither the viral genome nor the recombinant gene necessarily becomes stably incorporated into the plant genome:

> In recent years CaMV has attracted considerable interest as a potential genetic vector for plants, largely because cloned viral DNA can be introduced directly into plants simply by rubbing the DNA onto leaves with an abrasive, provided that the bacterial plasmid used to propagate CaMV in *Escherichia coli* has been excised...Viral particles accumulate in cytoplasmic inclusion bodies, spread throughout the plant, and can be found in most cells at high copy number. These properties of CaMV provide a useful way to introduce foreign DNA (**inserted in the CaMV genome**) directly into a whole plant.

(Exh. "N", Abstract at page 659) (emphasis added).

***The Prosecution History:***  Claim 3 (which adds the limitation that the DNA sequence is "operably incorporated into the genome of the host plant cell") originated from patent application claim 51, which was added in an amendment filed on September 9, 1991.  (Exh "E" at 3).  The inventors stated that the new claim was "supported in the specification, e.g., on page 15, lines 8-11 and in Example 21."  (*Id.* at 4).  These correspond to the passages in the printed patent at col. 8, ll.

18-20 ("It has been mentioned that this coupling can take place by the coincidence-controlled *integration of a gene into the genome of a plant transformed therewith*.") (emphasis added) and col. 31, ll. 18-35 (Example 21, which describes, with reference to Fig. 13, the tolerance of mature, transgenic tobacco plants to 2,4-D and related herbicides).  These passages are consistent with the inventors' clear intention, as evidenced by the differences in language between claims 2 and 3, to differentiate between claims to plants that are stably transformed, *i.e.*, have a gene operably incorporated (*i.e.*, integrated) into their genome, and claims to plants that do not require stable transformation.

As a result of this distinction, as well as all of the other intrinsic evidence discussed above, it would be erroneous to read a stable transformation limitation into claim 2 as DAS proposes.

### D.     Disputed Terms Present in Claim 4.

#### 1.     "hybridizable therewith"

The parties' respective positions on this limitation are as follows:

| Claim Limitation | Bayer Proposed Construction | DAS Proposed Construction |
|---|---|---|
| hybridizable therewith (claim 4) | the ability of a nucleic acid sequence to form a double stranded region with another nucleic acid sequence | [This term is indefinite and cannot be construed.] |

As can be seen, Bayer defines the phrase "hybridizable therewith" to mean "the ability of a nucleic acid sequence for form a double stranded region with another nucleic acid sequence." DAS, on the other hand, claims that this claim limitation cannot be understood because the claim does not specify the precise experimental conditions under which the hybridization experiment would be conducted.

It is worth noting at the outset that when presented with the term "hybridization" in *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325, 1333 (Fed. Cir. 2010), the Federal Circuit had no

such trouble.  The court held that "hybridization" has a "definite meaning," to wit, "the binding of two separate, complementary strands of nucleic acids to form nucleic acid hybrids."  *Id.*   This is essentially identical to Bayer's proposed construction here.  The evidence demonstrates that one of ordinary skill in the art would have known how to choose her hybridization conditions as a routine matter at the time the application leading to the '401 patent was filed.  It was therefore not necessary for the '401 inventors to specify particular hybridization conditions in order to make the claim understandable to one of ordinary skill in the art, as DAS insists.

  *The Claim Language:*  Claim 4 recites:

> 4.  A recombinant gene of claim 1, wherein **the DNA sequence is the structural gene sequence of FIG. 10** … **or a DNA sequence hybridizable therewith** … wherein the sequence … codes for a polypeptide having said biological activity.

(Exh. "A" at cert. of correction).  The gene claimed in claim 4 codes for a polypeptide that has "said biological activity" (*i.e.*, the biological activity of 2,4-D monooxygenase).  Thus, the *activity* of the gene product is clear.  Likewise, no ambiguity exists as to the *structure* of the DNA sequence shown in FIG. 10 (in which the polypeptide coding sequence is identified), to which the claimed gene must hybridize.  The remaining issue—whether a person of ordinary skill would understand what is being claimed by a DNA sequence which can "hybridize []with" such a gene— is easily dealt with.  A person of ordinary skill would understand that any DNA sequence that can form a stable, detectable double stranded region with the DNA sequence of Fig. 10 can "hybridize" with that DNA.  (Matthysse Decl., ¶¶ 81-89).  *See Enzo Biochem*, 599 F.3d at 1327; *LadaTech, LLC v. Illumina, Inc.*,  No. 09-627-SLR, 2012 WL 207937, at *1 n.6 (D. Del. Jan. 24, 2012) (employing the understanding that "hybridized" DNA is double-stranded).

  *The Specification:*  The specification refers to experiments using "southern hybridization." (Exh. A at col. 30, ll. 37-61).  Southern hybridization was a well-known method by the mid-1980s and was used to detect a "target" DNA sequence that can hybridize with a reference "probe" DNA

-21-

sequence, especially in cases where the probe has a biological activity of interest.  Such a hybridization experiment generally proceeds as follows:  Target DNA samples are "cut" into smaller fragments (typically by "restriction enzymes"), which are separated by size (using gel electrophoresis).  The target DNA is then separated into single strands ("denatured") and transferred to a membrane to be exposed to one or more probe DNAs.  Single-stranded target DNA fragments which are similar to single-stranded probe DNA fragments "hybridize."  This means that they form double-stranded regions together (in a so-called "hybrid duplex").  Excess probe is then washed away, leaving the hybrid duplexes behind.  It is a simple matter to detect these duplexes (for example, on X-ray film) because the probe DNA is "labeled" (for example, by binding to a radioactive substance).  (Matthysse Decl. ¶¶ 29-36).  This exemplary process is described inherently in the '401 patent, (Exh. "A" at col. 6, l. 62 to col. 7, l. 10), which explains that hybridization methods were known to be "conventional."  (*Id*. at col. 7, ll. 2-3).

The specification also cites several textbooks and laboratory manuals which describe the hybridization reaction conditions that were conventional at the time.  This is significant because prior art cited in a patent "constitutes intrinsic evidence."  *Powell v. Home Depot U.S.A., Inc*., 663 F.3d 1221, 1231 (Fed. Cir. 2011).  As explained in the specification, the "methods of genetic engineering" used in the '401 patent "have been utilized as they are generally known and well-tested in the field of art."  (Exh. "A" at col. 9, ll. 31-4).  The methods described in the patent had "already been incorporated into the textbooks," (*id*. at ll. 36-40, listing three textbooks).  Moreover, "general working directions in the form of laboratory manuals have also been utilized in many instances," (*id*. at ll. 44-53, listing five manuals).  One of these manuals, in particular, T. Maniatis *et al*., Molecular Cloning, ("Maniatis"), has long been regarded as a leading treatise in the

field of genetic engineering.[9]   (*See* Matthysse Decl. ¶¶ 20, 21, 23).   Indeed, the chemistry of hybridization reactions was well-known in the art years before the earliest effective filing date of the '401 patent.   (*Id*. ¶¶ 20, 62-80, 89).

*The Prosecution History:*   The patent examiner alleged in his final rejection that then-pending claim 46 was indefinite for much the same reason as DAS alleges now; *i.e.*, due to the presence of the phrase "a sequence hybridizable therewith."   (Exh. "R" at 3).   The examiner alleged, much as DAS does, that this claim limitation, standing alone, "places no functional or size limits" on the claimed DNA.   (*Id*.)   In response, Bayer pointed out that: (1) the claim had been amended "to include functional language *explicitly* specifying that sequences hybridizable with the specified sequences code for polypeptides having the biological activity of 2,4-D monooxygenase. This inherently implies a size limitation" (emphasis in original) and (2) "One of ordinary skill in the art would be able to routinely determine suitable hybridization conditions from the specification, *e.g.*, by reference to the Maniatis text incorporated by reference in the specification … ."   (Exh. "L" at 4).

The PTO Board of Appeals reversed the examiner's rejection, agreeing with Bayer.   The PTO Board held that the "last clause of claim 46 clearly requires that the 'DNA sequence hybridizable' is to have 'said biological activity' … of 2,4-D monooxygenase."   (Exh. "F" at 4).

*The Relevant Extrinsic Evidence:*   Although the PTO Board did not mention Bayer's second argument in its opinion (that "one of ordinary skill in the art would be able to routinely determine suitable hybridization conditions"), that argument is a complete answer to the issue

---

[9] *See Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc*., 55 F. Supp. 2d 1024, 1030 n.8 (N.D. Cal. 1999) (citing Maniatis as a "learned treatise" in the field of biotechnology).   In one of its published patent applications, DAS described the 1989 edition of the Maniatis manual (Sambrook *et al*.) as an "extensive guide to the hybridization of nucleic acids."   (Exh. "O" 2011/0129829, ¶[0042]). Another two of DAS's patents state that the first edition of Maniatis (which is also cited in the '401 patent) disclose "standard [hybridization] methods." (Exhs. "P", "Q").

DAS raises here.  In addition to the textbooks and manuals cited at column 9 of the '401 patent (which are expressly incorporated by reference at column 32), many other sources for the choice and optimization of hybridization conditions were known at the time of the invention.  It would have been counterproductive to incorporate all of these into the specification because a "patent need not teach, and preferably omits, what is well known in the art."  *Spectra–Physics, Inc. v. Coherent, Inc.,* 827 F.2d 1524, 1534 (Fed. Cir. 1987).

For example, *Nucleic Acid Hybridisation, A Practical Approach*, Hames *et al*. (1985) ("Hames"), is a comprehensive treatise dedicated to the theoretical and practical aspects of DNA hybridization.  Hames is cited in more than 4,000 patents (Mayle Decl., ¶ 21); (Exh. "S"), and over sixty U.S. patents, including at least seventeen assigned to DAS, cite Hames as a source for "conventional" hybridization stringency conditions.  (Matthysse Decl., ¶44).  This is significant because the '401 patent also uses the phrase "the conventional hybridization method" to refer to an experiment to identify other genes that are similar to the *tfdA* gene disclosed in the patent specification.  (Exh. A at col. 7, ll. 2-3).[10]  Such a "conventional hybridization method" is implied in claim 4.  The Hames textbook was written by leading scientists in the field (including Dr. Southern himself), and contains the conventional protocols over the range of stringency conditions that would be employed by one of ordinary skill in the art to perform such an experiment.  (Matthysse Decl., ¶¶ 46-51).

Moreover, many other articles directed to specific applications of hybridization reactions were available in the literature.  (*See* Matthysse Decl., ¶¶ 53-61).  By 1984, the science of hybridization was so well-characterized that an equation was developed which mathematically describes hybridization reaction conditions for any probe DNA sequence.  (*Id*., ¶¶ 22-25).

---

[10] "Conventional" means "developed, established, or approved by general usage; customary." (Exh. "V", American Heritage Dictionary, Second College Edition, 1985).

Tellingly, one of DAS's own published patent applications states that "variations in the stringency of hybridization and/or wash solutions are *inherently described*" by this well-known equation. (Exh. "O" ¶[0042]) (emphasis added).  DAS's patents for its accused *aad* genes also reference this equation.  (Exh. "P" at col. 34; Exh. "Q" at p. 22).  Using this standard equation, the entire universe of reasonable hybridization conditions known in the art can be mapped with mathematical precision.  (Matthysse Decl., ¶ 89; *id.*, ¶¶ 74-76, 87, 88).

Bayer's proposed definition is also consistent with specialized dictionaries.  *See*, *e.g.*, Dictionary of Plant Genetics and Molecular Biology (1998), defining "DNA-DNA hybridization": "When DNA from the same or different sources is heated and then cooled, double helixes will reform at homologous regions. This technique is useful for determining sequence similarities and degree of repetitiveness among DNAs."  (Exh. "T"); A Dictionary of Genetics (7th ed. 2006), defining "Hybridization":  "the pairing of complementary DNA single strands to produce a DNA-DNA hybrid."  (Exh. "U").

**The claim is not "insolubly ambiguous"**:  Because DAS alleges that claim 4 is indefinite it bears the heavy burden of showing that the claim is so "insolubly ambiguous" that "reasonable efforts at claim construction prove futile."  *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1375 (Fed. Cir. 2001) (reversing summary judgment of indefiniteness).[11]  Conversely, so long as "those skilled in the art would understand what is claimed," the definiteness requirement is satisfied. *Enzo Biochem*, 599 F.3d at 1332 (citation omitted).  In this inquiry, "general principles

---

[11] A claim can be invalidated as indefinite only as a last resort, *i.e.*, when the claim is "insolubly ambiguous, *and no narrowing construction can properly be adopted*."  *Microprocessor Enhancement Corp. v. Texas Instruments Inc.*, 520 F.3d 1367, 1374 (Fed. Cir. 2008) (emphasis added).  Even if it is a "formidable" task to understand a claim (which concern is absent here), and the result not unanimously accepted, as long as the boundaries of a claim may be understood it is sufficiently clear to avoid invalidity for indefiniteness. *Invitogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374, 1383 (Fed. Cir. 2005).

-25-

of claim construction apply." *Id.* The crux of DAS's argument is that "Bayer's proposed construction fails to specify reaction conditions and one of skill would thus not know the scope of the limitation." (D.I. 126 at 2). The problem for DAS is that the range of reaction conditions that were conventionally used when the application for the '401 patent was first filed was well defined and widely known. Therefore, it was not necessary for the claim to specify this routine and well known information.

In *Enzo Biochem*, neither the district court nor the Federal Circuit took issue with the definiteness of the claim term "hybridization," which was held to mean the binding of two separate, complementary strands of nucleic acids to form nucleic acid hybrids. Rather, the ambiguity (at least in the district court's view), was that a person of ordinary skill would not understand whether a certain chemical linkage would "*substantially* interfere" with hybridization, as was claimed. *Id.*, 599 F.3d at 1332-35.[12] No such issue exists here.

One of the disputed claim terms in *Life Technologies Corp. v. Biosearch Technologies, Inc.*, No. 2:09-CV-283-TJW-CE, 2011 WL 4431854, at *12-14 (E.D. Tex. Sept. 22, 2011), related to a measurement of fluorescence intensity when a DNA sequence was hybridized to a target DNA sequence. The court rejected the accused infringers argument that the claim was indefinite: "Defendants fail to address Plaintiffs' evidence indicating that optimization of oligonucleotide hybridization conditions were routine and well known in the art at the time the Livak patents were issued. … Considering this, the court is not convinced that one of ordinary skill in the art would be unable to determine the boundaries of these limitations." *Id.* at *13. In this case, as in *Life Technologies*, claim 4 inherently includes the conventional conditions used in hybridization

---

[12] *See also id.* ("the fact that the binding strength of a DNA strand may vary, based on the length and sequence of the strand" did not mean that a particular experimental condition would "depend solely on the unrestrained, subjective opinion of a particular individual…") (distinguishing *Datamize, LLC v. Plumtree Software, Inc*., 417 F.3d 1342, 1350 (Fed. Cir. 2005)).

experiments at the time.  As stated, those conditions were well understood by those of ordinary skill in the art.

Another case supporting Bayer's position is *Oxford Gene Technology Ltd. v. Mergen Ltd.*, No. 02-1695-KAJ, 2004 WL 2211971 (D. Del. Sept. 29, 2004), where the claim phrase at issue was "under hybridisation conditions."  The District of Delaware concluded that "under hybridisation conditions" simply means "under conditions suitable for hybridization."  *Id.* at *10. The Court rejected the accused defendant's proposed definition because it is error to "read in limitations from the specification when the term is easily construed according to its ordinary meaning as understood by a person of ordinary skill in the art."  *Id.* (citing *Texas Digital Sys., Inc., v. Telegenix, Inc.*, 308 F.3d 1193, 1205 (Fed. Cir. 2002)).  Note that defendant did not even attempt to urge that this claim phrase was indefinite.[13]

The Federal Circuit has explained that in patent claims, "[m]athematical precision is not required—only a reasonable degree of particularity and definiteness."  *Exxon Research*, 265 F.3d

---

[13] It is, in fact, quite unusual for a party, such as DAS in this case, to urge that a claim limitation that includes a variant of the word "hybridization" is "insolubly ambiguous" because the term is so well understood in the biotechnical arts.  Another example, in addition to those discussed in the text, is *Schering Corp. v. Amgen Inc.*, 18 F. Supp. 2d 372, 387 (D. Del. 1998), where the parties agreed that "hybridization includes the process by which one strand of DNA or RNA binds and forms a double-stranded structure with a complementary strand of RNA or DNA."  The parties also agreed that hybridization is "affected by such factors as time of exposure, temperature, salt concentration, and the degree of homology … between the two segments."  *Id.*  The dispute was not whether the claim was indefinite, but whether or not the claim required "specific hybridization conditions."  *Id.*  Using the specification as a guide, the Court held that the term "hybridize" includes "conditions at least as stringent as those set forth in the specification."  *Id.* at 387. Similarly, in this case, claim 4 is easily construed to include the entire range of "conventional" hybridization conditions  known in the art at the time the application was filed.  *See Life Technologies Corp.*, 2011 WL 4431854, at *14 ("Although it is improper to import the exact formula (described in the specification) for achieving the recited reactions into the claims … the claim language must be limited to the methods used to achieve the reactions as of … the filing date of the '848 patent.").  *Accord*, *Oxford Gene Technology*, 2004 WL 2211971, at *10.

at 1381.   For example, in *Hybritech Inc. v. Monoclonal Antibodies, Inc*., the Federal Circuit reversed a finding of indefiniteness for claims directed to "antibody affinity."   802 F.2d 1367, 1385 (Fed. Cir. 1986).  The Court explained that even if the argument that there was "no standard set of experimental conditions" in existence which could be "used to estimate affinities" was credited, "if the claims, read in light of the specification, reasonably apprise those skilled in the art both of the utilization and scope of the invention," the claims are definite.  Because the evidence showed that calculating affinity "was known in the art at the time of filing," notwithstanding the fact that such calculations "are not precise, or 'standard,'" the claims were "as precise as the subject matter permits."  *Id*.

In this case, the evidence shows that the range of DNA hybridization conditions over which one skilled in the art would perform a hybridization experiment was well-known at the time of the invention.  Moreover, the effect of varying those conditions could be calculated with mathematical precision. (Matthysse Decl., ¶ 89;  *id*., ¶¶ 74-76, 87-89).   A skilled artisan who was using hybridization to determine whether a known gene was successfully inserted into host DNA would have used highly stringent hybridization conditions.  (*Id*. ¶¶ 41-42).  In contrast, a skilled artisan interested in finding similar genes among different species or organisms by comparing the *tfdA* probe with unknown DNA from another source—which is the purpose of claim 4—"would design an experiment in a way that she could evaluate whether hybridization occurred over a range of stringencies."  (*Id*. ¶¶ 43-51).  Claim 4 therefore cannot be "insolubly ambiguous" merely because it does not recite reaction conditions.  *See Exxon Research*, 265 F.3d at 1375; *Hybritech*, 802 F.2d at 1385.

### E.      Conclusion.

For all of the foregoing reasons, Bayer respectfully urges the Court to adopt Bayer's proposed constructions and to reject DAS's constructions.

*/s/ Travis S. Hunter*

OF COUNSEL:

Frederick L. Cottrell, III (#2555)

Jeffrey L. Moyer (#3309)

Robert J. Koch

Anne Shea Gaza (#4093)

Jay I. Alexander

Travis S. Hunter (#5350)

Arie M. Michelsohn

Richards, Layton & Finger, P.A.

MILBANK, TWEED, HADLEY

One Rodney Square

  & McCLOY, LLP

920 North King Street

1850 K Street NW, Suite 1100

Wilmington, DE  19801

Washington, DC  20006

(302) 651-7700

(202) 835-7500

cottrell@rlf.com

rkoch@milbank.com

moyer@rlf.com

jalexander@milbank.com

gaza@rlf.com

amichelsohn@milbank.com

hunter@rlf.com

DATED:  March 13, 2012

*Attorneys for Plaintiff*
*Bayer CropScience AG*

-29-

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2012, I caused to be served copies of the foregoing document in the manner indicated below and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following counsel of record:

**VIA E-MAIL**
Steven J. Balick
Lauren E. Maguire
Andrew C. Mayo
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
lmaguire@ashby-geddes.com
amayo@ashby-geddes.com

**VIA E-MAIL**
Peter A. Bicks
Alex V. Chachkes
Joseph A. Sherinsky
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
212-506-3748
pbicks@orrick.com
achachkes@orrick.com
jsherinsky@orrick.com

Elizabeth A. Howard
ORRICK, HERINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
(650) 614-7400
ehoward@orrick.com

Hardip B. Passananti
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA  92614
(949)567-6700
hpassananti@orrick.com

*/s/ Travis S. Hunter*
Travis S. Hunter (#5350)
hunter@rlf.com

RLF1 5903968v. 1