IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------------X
                                                                   :
BAYER CROPSCIENCE AG,                                              :
                                                                   :
                              Plaintiff,                           :
                                                                   :   1:10-cv-1045-RMB-JS
                                                                   :
              v.                                                   :
                                                                   :
                                                                   :
DOW AGROSCIENCES LLC,                                              :
                                                                   :
                              Defendant.                           :
                                                                   :
-------------------------------------------------------------------X
```

DECLARATION OF ALAN JONES
IN SUPPORT OF PLAINTIFF BAYER'S CLAIM CONSTRUCTION BRIEF

I, Alan Jones, declare that:

1.   I am the George and Alice Welsh Distinguished Professor in the Department of Biology at the University of North Carolina, Chapel Hill.  I have been working in the area of plant biology for 34 years and have published over 140 scientific manuscripts on various topics in plant biology, although the large majority concern the plant growth hormone, auxin.  My CV is attached as Exhibit A.

2.   My laboratory explores how endogenous and exogenous signals are perceived in plant cells.  Endogenous signals are molecules like plant hormones, including the growth hormone family auxin, of which 2,4-D is a synthetic member.  Examples of exogenous signals are light, temperature, touch, and water.  I was in graduate school from 1978-1983 and in

1

postdoctoral training from 1983-1986, the collective time period when much of the relevant background science occurred for the patent that is the subject of this litigation.

3.   I have been asked by the Milbank law firm to submit this Declaration in connection with Bayer CropScience's constructions of certain claim limitations in U.S. Patent No. 6,153,401 ("the '401 patent"). For purposes of this Declaration I have reviewed the '401 patent and certain public documents as set forth below. Because of my experience in graduate school and postdoctoral training during the early and mid-1980s as stated above I believe I have been able to view the '401 patent from the perspective of the art at the time at which it was first filed.

4.   I am being compensated at a rate of $195 per hour for my expert consulting services.

**OPINIONS**

5.   In 1985, Comai and coworkers published a paper in Nature showing they had succeeded in transforming plants with a mutant counterpart gene from bacteria called EPSP synthase. EPSP synthase is an enzyme important for amino acid synthesis in both bacteria and plants. (L. Comai. *et al.*, *Expression in Plants of a Mutant aroA Gene from Salmonella typhimurium confers tolerance to glyphosate*, Nature 317 (Oct. 24, 1985). The mutant enzyme from bacteria had the distinctive property of being less sensitive to an herbicide called glyphosate, which is a potent inhibitor of EPSP synthase. By introducing the mutant enzyme into plants, Comai et al succeeded in making the plants tolerant to this herbicide. Glyphosate-tolerant crop plants have since become commercially important throughout the world as farmers are able to use much more efficient applications of herbicide with such herbicide-tolerant plants. However, over the past 20+ years, many weeds have developed resistance to glyphosate and

there has been an increasing need for alternative herbicides for use in conjunction with herbicide-resistant crop plants.

6. The herbicide 2,4-D has been in commercial use for many decades. The 2,4-D molecule is considered an artificial "auxin"—a growth hormone in plants. At low concentrations, plants generally require auxins for healthy growth. However, when given 2,4-D at higher levels, growth goes out of control and the plants exposed to such levels of 2,4-D die.

7. In the mid-1980s, scientists at what was then the Schering corporation (now Bayer CropScience) began working on isolating genes from bacteria that break down 2,4-D, with the goal of making plants that are resistant to 2,4-D. Several species of bacteria were known at the time that could grow on 2,4-D as a substrate (food). The first step in the metabolic breakdown of 2,4-D in such bacteria involves cleavage of the 2,4-D side chain to form 2,4-dichlorophenol ("2,4-DCP"). Although the conversion of 2,4-D into 2,4-DCP eliminates 2,4-D as an auxogenic growth factor that can kill plants at high concentrations, it was not known whether 2,4-DCP would, itself, be toxic to plants. It is generally true that phenols as a class of molecules are toxic at some level to all eukaryotic cells. Because it is structurally similar to auxins, moreover, it was thought that 2,4-DCP might also have some residual herbicidal activity at high levels. Further, since many enzymatic reactions in eukaryotic cells involve aromatic substrates, it would be unpredictable to know what the introduction of a foreign aromatic molecule like 2,4-DCP would do to plant cells. Thus, if produced by plant cells internally, 2,4-DCP could have significant adverse effects on the growth of plant cells.

8. More generally, the success by Comai et al to induce glyphosate resistance in plants involved introduction of a bacterial gene that was very similar to a gene that already existed in plants. However, it was not generally believed that the introduction of totally foreign

3

genes conferring a novel biological activity in plants would yield a fruitful approach to inducing herbicide resistance.  Taken together with the additional uncertainties involved with the potential toxicity of foreign aromatic compounds and phenols to plant cells, at the time that the application leading to the '401 patent was first filed in 1986, it was not known whether a gene expressing a polypeptide that could cleave the side chain of 2,4-D (to make 2,4-DCP) would be effective as a way to induce resistance to the 2,4-D herbicide in plants.

9. For example, a paper by Perkins et al published in 1987 (after the priority application leading to the '401 patent was filed) attests to the concern in the art that 2,4-DCP would be toxic to plants.  *See* Perkins *et al*., Use *of Alcilagenes eutrophus as a Source for Genes for 2,4-D Resistance in Plants*, Weed Sci. (1987), 35 (Suppl. 1):12-18.  While Perkins et al appeared to show 2,4-DCP applied externally to plants is less toxic than 2,4-D, they did not assuage the concern that endogenously-produced 2,4-DCP would be toxic.  I note in this regard that plants cells have a cuticle that can protect plant cells from exogenously applied toxins, at least to some degree.

10. The '401 patent discloses how to isolate genes from soil bacteria that cleave the side chain of 2,4-D to form 2,4-DCP.  The isolation of such genes involved the use of so-called "complementation" assays.  As a molecular biologist, I understand the disclosure of those assays in the '401 patent (and in the corresponding 1987 paper by Streber et al., J. Bacteriol. 169(7):2950-55 (1987) involved the screening for bacteria transformed with foreign DNA sequences to grow in the presence of a substrate (2,4-D, 4-chlorophenol, or phenoxyacetic acid, depending on the bacterial stain used) that it otherwise could not grow on, and then isolating from those transformed bacteria the DNA sequences encoding the requisite activity.

11. More specifically, the specification describes in detail the specific assays, using bacterial strains lacking a 2,4-D degrading function, for isolating not just the exemplary *tfdA* gene from *Alcaligenes eutrophus*, but any DNA sequence that encodes a polypeptide having a comparable biological (enzymatic) activity of cleaving the side chain of 2,4-D to form as a degradation product the corresponding phenol, 2,4-DCP. *See* the '401 patent at Col. 3, ll. 11-36; Cols. 24-25 (Example 14), *esp*. Col 25, ll. 14-23. As noted in the specification (Col. 3, ll. 22-25), "[s]uch bacterial strains have the property of being able to exploit as sources of carbon and energy the products formed in an enzymatic reaction in vivo by 2,4-D-monooxygenase, but not the substrates thereof." In other words, the mutant bacteria can grow in the *products* of the reaction performed by an enzyme then called "2,4-D monooxygenase," but *not* in 2,4-D, itself (i.e., the "substrate" of the "2,4-D monooxygenase" enzyme). The "products" refer to 2,4-D's corresponding phenol, 2,4-DCP, which occurs by cleavage of the side chain of 2,4-D. *See, e.g.*, Col. 2, ll. 25-27; Col. 7, ll. 19-24.

12. Thus, the mutant bacteria *lack* a functional enzyme polypeptide having the biological activity of cleaving the side chain of 2,4-D to form 2,4-DCP, which is the first step in the metabolic pathway employed by various species of soil bacteria to degrade 2,4-D. *See* Col. 2, ll. 21-40. The mutant bacteria do, however, contain the other enzymatic activities in the pathway, and thus are able to grow on 2,4-DCP. *See* Col. 3, ll. 26-28. Because the mutant bacteria lack only the first step in the pathway, when these mutant bacteria are transformed with a foreign DNA sequence encoding a polypeptide having the biological activity of cleaving the side chain of 2,4-D to form 2,4-DCP, they acquire the ability to survive in growth medium containing 2,4-D (called the "selection" medium). The foreign DNA sequence that confers this ability is said to "complement" the enzymatic activities already present in the mutant bacteria.

5

Such DNA sequences thus can be readily identified and isolated from any soil bacteria having an enzymatic activity that cleaves the side chain of 2,4-D to form 2,4-DCP, through selection in the functional complementation assays described in the specification . Mutant bacteria that have incorporated such sequences are immediately apparent, because they are able to survive in the 2,4-D selection medium used in the assays, whereas mutant bacteria that have not incorporated such a sequence will die in this medium. The complementation assays will directly select for transformed bacteria containing a DNA sequence encoding a polypeptide having the biological activity of cleaving the 2,4-D side chain to form 2,4-DCP, regardless of what this polypeptide is called. The specification further describes two other bacterial strains (JMP222 and B13), which also lack the ability to cleave the side chain of molecules closely related to 2,4-D. Such strains also can be used to isolate DNA sequences having a function comparable to the polypeptide encoded by the exemplary *tfdA* gene, which is able to cleave the side chain of 2,4-D as well as other, similar molecules. *See* Col. 7, ll. 19-57. As a matter of basic science, the scope of DNA sequences that can be obtained by these complementation assays extends not just to the exemplary *tfdA* gene but to any *tfdA*-like gene, i.e., any gene encoding a polypeptide having the same biological (enzymatic) activity, or function, of cleaving the side chain of 2,4-D to form 2,4-DCP.

13.    Those assays, to my mind, as described in the '401 patent, would enable any competent molecular biologist of ordinary skill, using the bacterial strains in the manner disclosed in the '401 patent, to isolate and obtain any DNA sequence encoding a polypeptide having the biological activity of cleaving the side chain of 2,4-D (or a comparable phenoxyacetic acid auxin) to its corresponding phenol. Accordingly, I read the language of claim 1 of the '401 patent, "a DNA sequence encoding a polypeptide," as corresponding in breadth at least to the

scope of DNA sequences obtainable using such assays and certainly not as limited to one particular sequence (the tfdA gene isolated from *Alcaligenes eutrophus*) as DAS would have it. To the contrary, it is clear in reading the '401 patent that it is meant to disclose to one of ordinary skill in the art how to actually obtain such sequences.

14. Once isolated, the '401 patent also teaches the combination of structural genes encoding polypeptides that cleave the side chain of 2,4-D with a *heterologous promoter* that is capable of inducing expression of such genes in plant cells.

15. I will now present a brief tutorial on the molecular biology of gene expression in plant cells to give a better understanding of how a "heterologous promoter" can render a bacterial gene capable of being expressed in a plant.

16. I begin with explaining the concept of a "structural gene." A structural gene is a DNA sequence that encodes a polypeptide, i.e., a chain of amino acids. As most anyone will recall from high school biology, amino acids are the building blocks of all polypeptides (notably including proteins, which generally have a particular biological activity). This term has been part of the modern biology lexicon for decades. In order for such a structural DNA sequence to lead to the formation of a polypeptide, the DNA sequence first needs to be expressed as a messenger RNA ("mRNA") molecule. The expression of mRNA from a structural DNA sequence occurs through a process called "transcription." (In turn, as may also be recalled from high school biology, mRNA can then be "translated" into a corresponding polypeptide through a process called "translation.") The transcription of a structural DNA sequence into mRNA is controlled in cells by regulatory DNA sequences that generally are located before ("upstream" of) the structural coding sequences. Such upstream regions that contain the necessary regulatory elements to promote transcription are called "promoter" sequences.

17.     Thus, in order for a coding region of a structural DNA sequence to ultimately yield a functional polypeptide, the first step is regulation of transcription of the structural DNA sequence by a promoter sequence to form a corresponding mRNA molecule, which can then be "translated" into the polypeptide. Transcription involves the binding of so-called "transcription factors," which are protein factors that recognize specific sequences in promoter regions of DNA. During transcription, the coding strand of DNA is copied by a protein complex that moves along the coding DNA strand in a particular direction, which is called the "5' to 3' ("five prime to three prime") direction, as the so-called "3'" ("three-prime") phosphate group on each RNA base is linked to the "5'" ("five-prime") hydroxyl group of the next base. i.e. 5' hydroxyl → 3' phosphate → 5' hydroxyl → '3 phosphate and so on. By standard convention, molecular biologists arrange the sequence of an mRNA or gene from 5' on the left to 3' on the right. Translation involves recognition of a transcribed mRNA by a protein-producing machine called a "ribosome." Recognition occurs in part by transcribed DNA sequences in the 5' promoter region recognizing a corresponding binding site in the ribosome. The processes of transcription and translation together lead to "expression" of a structural gene as a polypeptide having a particular biological activity.

18.     In this regard, there is a major distinction between promoters in so-called "prokaryotes" (i.e., lacking a nucleus) like bacteria on the one hand, and promoters in so-called "eukaryotes" (i.e., having a nucleus) like plants. Promoters capable of expressing its cognate structural DNA in prokaryotic cells are fundamentally different from promoters capable of expression in eukaryotic nuclei. In simple terms, prokaryotic transcription factors generally differ from eukaryotic transcription factors and generally recognize different regulatory sequences in promoters. Further, prokaryotic ribosomes differ from eukaryotic ribosomes and

differ in their recognition sites on mRNA derived from the promoter region attached to the structural gene. Thus, the particular nature of the promoter region of a structural gene is critical for the proper expression of a structural gene in a particular kind of cell (e.g., prokaryote vs. eukaryote, bacterial vs. plant). Accordingly, a bacterial (prokaryotic) promoter region of DNA will generally be rather different from a plant (eukaryotic) promoter region of DNA, and a prokaryotic promoter region will not generally operate to control transcription of a gene in a eukaryotic cell (and vice versa). Thus, for example, a bacterial gene encoding a polypeptide that cleaves the side chain of 2,4-D to make 2,4-DCP will not be capable of expression in a plant so long as the bacterial gene has a bacterial promoter sequence.

19. Interestingly, however, some pathogenic bacteria and most viruses that infect eukaryotic cells contain certain genes that have evolved to become capable of expression in eukaryotic cells in order to pirate the transcriptional and translational machinery of its eukaryotic host. This is a major basis for disease caused by pathogenic bacteria and viruses. Such promoters, although found in prokaryotic or viral genomes, are *capable* of driving expression of structural genes in eukaryotic cells. For example, the promoter (designated NOS) for the bacterial gene encoding the enzyme nopaline synthase evolved in *Agrobacterium* bacteria to be capable of driving expression of that gene in plant cells that have been infected with such bacteria. The nopaline synthase made by plants infected with the bacteria causes production of an unusual amino acid called nopaline. Plants cannot metabolize nopaline, but *Agrobacterium* can degrade nopaline to release nitrogen. This is the basis for the ability of *Agrobacterium* to, in effect, commandeer the transcription machinery in an infected plant and steal its nitrogen. Another example is found in the plant virus cauliflower mosaic virus (CaMV) which contains a promoter capable of expression in a plant, which, when expressed in a plant infected by the

virus, enables the virus to replicate itself. The NOS and CaMV promoters are said to be "constitutive" promoters because they are always active.

20. Also known in the art are so-called "inducible" promoters, which only function in the presence of a particular inducing signal. For example, "light-inducible" promoters only function in the presence of certain wavelengths of light. The '401 patent discloses the use of such a light-inducible promoter, called the "ST-LS1" promoter, obtained from certain bacteria. Example 17 shows the fusion of the exemplary TfdA-coding DNA sequence (denoted "DPAM") to either "the cauliflower mosaic virus (CMV) 35S promoter" or "the light-inducible promoter of gene ST-LS1."; *see also* col. 8, ll. 56-64: "a plant/bacterial hybrid gene for 2,4-dichlorophenoxyacetic acid monooxygenase (DPAM) can be constructed and inserted into various plasmids in order to effect transfer and expression of the gene in plants. The flanking sequences to the bacterial gene, both 5' and 3', may be engineered by means known in the art for making the hybrid gene capable of expression in the plant. For example, constitutive or inducible promoters may be inserted at the 5'-end of the gene."). Indeed, the specification makes clear that "[v]ectors for the expression of prokaryotic genes in plants are known in the literature and are generally available." *See* col. 8, ll. 40-44. (*citing* N. Brisson and T. Hohn, 1986, Plant Virus Vectors; Cauliflower Mosaic Virus, in S. P. Colowick and N. O. Kaplan (ed.), Methods in Enzymology, 118 : 659. To my mind this is an accurate statement. The use of plant-expressible promoters, such as viral and bacterial sequences that are capable of promoting the expression of foreign genes in plants, was well-known in the art by the time the '401 patent inventors filed their original patent application in 1986. *See, e.g.*, Paszkowski et al., EMBO J. 3:2717 (1984); Potrykus et al., Mol. Gen. Genetics 199:183 (1985); Fromm et al., Nature 319:791 (1986); Horsch et al., Science 223:496 (1984); Jones et al., EMBO J. 4:2411 (1985); Fromm et al.,

10

PNAS 82:5824 (1985); Comai et al., Nature 317 (1985); Uchimiya et al., Mol Gen. Genet. 2:204 (1986).

21.     The specification's description of plant-expressible promoters highlights the fact that the mere presence of a such a promoter operably linked to a structural gene does not, itself, require the structural gene actually to be expressed in a plant.  Indeed, the Cauliflower Mosaic Virus may be viewed as containing a promoter *capable of* promoting expression of a structural gene in a plant (indeed, in virtually any plant), but need not actually transform a plant in order to do be capable of doing so.  This is also true of the so-called "NOS" promoter in *Agrobacterium*, which can infect plants and cause them to express foreign structural genes.  The "NOS" promoter, like the 35S promoter, is capable of promoting expression of a structural gene in plants, whether or not an *Agrobacterium* actually infects a plant with the NOS promoter operably linked to a structural gene and actually promotes expression of the gene.  Likewise, the recombinant gene of claim 1 simply requires a heterologous plant-expressible promoter operably linked to a structural gene encoding a polypeptide having a particular biological activity.  It does not require actual transformation of, or expression in, a plant.

22.     Thus, as a general principle, in order to enable a prokaryotic gene (such as a prokaryotic gene encoding a polypeptide that cleaves the side chain of 2,4-D) to be capable of being expressed in a plant cell, the structural gene sequence obtained from the bacteria must be operably linked to a suitable promoter that is capable of driving expression in a plant cell.  This could be, for example, a promoter region of DNA isolated from a plant cell, or, as discussed above, a bacterial or viral promoter (such as the NOS promoter or the CaMV promoter) that has evolved in viruses and bacteria to be capable of driving the expression of a structural gene in a plant cell.  By the time the '401 patent was originally filed in 1986, such plant-expressible

11

promoters were known to be capable of promoting the expression of a prokaryotic gene in a variety of plant cell types including petunia, tobacco, asparagus, rye grass, carrot, and maize.

23. I note further in this regard, however, that the same promoters were used in a variety of plant cell types but using only a very small number of bacterial structural genes. Thus, by the time the '401 patent was filed, promoter sequences capable of promoting the expression of a structural gene in a plant cell had been well-established. However, their application to expression of bacterial genes in plant cells was limited, and, given the uncertainties involved in expression of aromatic compounds and phenols in plant cells, their ultimate effect if applied to bacterial genes such as those that cleave the side chain of 2,4-D, was unknown.

24. I have been asked in particular to comment upon how one of ordinary skill in the art would have understood the phrase "capable of expression in a plant" as that phrase is used in claim 1 of the '401 patent in 1986. As discussed above, in order for a bacterial (prokaryotic) structural gene to be expressed in a plant cell requires that the bacterial structural gene be operably linked to a promoter region of DNA that is capable of (1) binding plant-specific (eukaryotic) transcription factors and (2) binding plant-specific (eukaryotic) ribosomal binding sites. Those two elements are generally absent from bacterial promoters that promote the expression of bacterial genes in bacteria. Such elements are present, however, in promoters endogenous to plant cells that drive the expression of a plant's own genes, as well as (as discussed above) bacterial and viral promoters that have evolved specifically to promote the expression of eukaryotic genes, such as the NOS and CaMV promoters.

25. In reading claim 1 of the '401 patent, one skilled in the art would understand the claim to recite two basic things: (1) "*a DNA sequence encoding a polypeptide*" (i.e., a structural gene), which has the biological activity of 2,4-D monooxygenase (i.e., as defined in the patent at

12

Col. 2, ll. 25-27 and 65-67, the biological activity of cleaving the side chain of 2,4-D); and (2) "*a heterologous promoter*," which is "capable of promoting the expression in a plant of a structural gene operably linked thereto." This structure is illustrated at the bottom of Figure 11 of the patent, on which I have highlighted the structural gene in red and the promoter sequence in green:



26. I note that bacterial genes from soil bacteria having the biological activity of 2,4-D monooxygenase (such as the *tfdA* gene from *Alcaligenes eutropus* described in the '401 patent) contain an endogenous bacterial promoter that is not capable of promoting expression of such genes in plants (or any other eukaryotic cells) because such bacterial promoter sequences (as discussed above) are not generally capable of binding eukaryotic transcription factors, nor are they capable of recognizing eukaryotic ribosomal binding sites. In order for such a bacterial structural gene to be expressed in a plant, the bacterial structural gene would have to be operably linked to a promoter that is capable of promoting expression in a plant—i.e., a so-called "plant-expressible" promoter, such as an endogenous plant promoter or a bacterial or viral promoter that

13

has evolved to be capable of promoting expression of a structural gene in a plant, such as a NOS or CaMV promoter. Thus, the recitation of "a heterologous promoter" in claim 1 that is capable of promoting expression of a structural gene in plants clearly refers to a promoter that is not a bacterial promoter (i.e., a promoter having bacterial transcription factor and ribosomal binding sites), but rather is a plant-expressible promoter (either from plants, or from bacteria or viruses that have evolved plant-expressible promoters) that has the appropriate transcription factor and ribosomal binding sites characteristic of plants and by virtue of which the promoter renders the gene to which it is operably linked capable of being expressed in a plant. I note that the term "heterologous" refers to the fact that the "heterologous" promoter comes from a source different from the source of the DNA encoding a polypeptide having the biological activity of cleaving the side chain of 2,4-D. This makes good sense, since soil bacteria containing such a gene have a bacterial promoter attached, which is not capable of promoting expression of a structural gene in a plant. Thus, a foreign ("heterologous") regulatory element, one which is from a different source than the claimed structural gene, which *is* capable of promoting expression of a structural gene in a plant, must be operably linked to the recited DNA sequence encoding a polypeptide, in order to render that DNA sequence capable of being expressed in a plant by virtue of containing regulatory sequences that are recognized by plant transcription factors and plant ribosomes.

27.     I further note that claim 1 uses the phrase "capable of being expressed in a plant" to describe the recited structural gene, in parallel with the phrase "capable of promoting the expression in a plant" to describe the recited heterologous promoter:

1. A recombinant gene, comprising

   a DNA sequence encoding a polypeptide having the biological activity of 2,4-D monooxygenase which is capable of being expressed in a plant, operably linked to

   a heterologous promoter capable of promoting the expression in a plant of a structural gene operably linked thereto.

This parallel language appears to directly correspond to the promoter and structural gene elements of the "recombinant gene" of claim 1, consistent with the illustration in Fig. 11 of the '401 patent shown above and reproduced below for convenience:



This parallelism in language and its correspondence to the heterologous promoter and structural coding regions of the claimed "recombinant gene" of claim 1 further convinces me that one of ordinary skill reading claim 1 would recognize that the first phrase, "capable of promoting the expression in a plant," refers to the fact that the claimed DNA sequence encoding a polypeptide

15

(structural gene) has a (heterologous) plant-expressible promoter operably linked to it that renders the DNA sequence capable of being expressed in a plant; and that the claimed heterologous promoter is operably linked to a structural gene, which thereby renders that structural gene capable of being expressed in a plant. The "capable of being expressed" and "capable of promoting the expression" language of the claim thus refers to the linkage of a plant-expressible promoter with a structural gene; and nothing more. Nothing in the claim language appears to actually require transformation of the structural gene into a plant, or expression of the structural gene in a plant.

28.     As further evidence that my understanding of claim 1 is correct, I note that if claim 1 were to actually require transformation and/or expression of a DNA sequence in a plant, there effectively would be no difference between claim 1 on the one hand and claims 2 and 3 on the other hand. Claim 2 and 3 are drawn to transgenic plants containing a recombinant gene of claim 1; and if claim 1 already required transformation and/or expression in plants, then claim 1 would also be drawn to transgenic plants and I would see no point in having claim 1 in the first place.

29.     I further note that, for example, claim 11 of the '401 recites a bacterium containing the recombinant gene of claim 1. If claim 1 required actual transformation of and/or expression in a plant, it is difficult to understand how claim 11 could be drawn to a bacterium, which clearly it is.

30.     Finally, I have been asked to comment on whether claim 2 of the '401 patent, which is drawn to a "transgenic plant containing a recombinant gene of claim 1," requires that the recombinant gene be "stably integrated." I do not believe that this is necessary. Indeed, I note that the '401 patent discloses transgenic plants that contain a recombinant gene that is <u>not</u>

16

"stably incorporated" into the genome.  As noted above, the specification incorporates by reference an article that describes use of the Cauliflower Mosiac Virus (CaMV) as a vector for transforming plants.  (Brisson and Hohn, Plant Virus Vectors; Cauliflower Mosaic Virus, in S. P. Colowick and N. O. Kaplan (ed.), *Methods in Enzymology*, 118 : 659) (referenced at col. 8, ll. 40-42).  I note that this article, itself, explains that viral vectors, such as the CaMV, express recombinant genes in the viral genome under the control of a viral promoter, and neither the viral genome nor the recombinant gene becomes stably incorporated into the plant genome:

> In recent years CaMV has attracted considerable interest as a potential genetic vector for plants, largely because cloned viral DNA can be introduced directly into plants simply by rubbing the DNA onto leaves with an abrasive, provided that the bacterial plasmid used to propagate CaMV in *Escherichia coli* has been excised...Viral particles accumulate in cytoplasmic inclusion bodies, spread throughout the plant, and can be found in most cells at high copy number. These properties of CaMV provide a useful way to introduce foreign DNA (<u>inserted in the CaMV genome</u>) directly into a whole plant.

(Abstract at page 659) (emphasis added).

      I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed this 13th day of March, 2012, at Chapel Hill, North Carolina.



      Alan Jones, Ph.D.

## CERTIFICATE OF SERVICE

I hereby certify that on March 13, 2012, I caused to be served copies of the foregoing document in the manner indicated below and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following counsel of record:

**VIA E-MAIL**
Steven J. Balick
Lauren E. Maguire
Andrew C. Mayo
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
lmaguire@ashby-geddes.com
amayo@ashby-geddes.com

**VIA E-MAIL**
Peter A. Bicks
Alex V. Chachkes
Joseph A. Sherinsky
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
212-506-3748
pbicks@orrick.com
achachkes@orrick.com
jsherinsky@orrick.com

Elizabeth A. Howard
ORRICK, HERINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400
ehoward@orrick.com

Hardip B. Passananti
ORRICK, HERINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA 92614
(949)567-6700
hpassananti@orrick.com

*/s/ Travis S. Hunter*_____
Travis S. Hunter (#5350)
hunter@rlf.com