# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------X
        :

**BAYER CROPSCIENCE AG,**      :

       **Plaintiff,**      :

        :      **C.A. No. 10-1045-RMB-JS**

        :

      **v.**      :

        :

**DOW AGROSCIENCES LLC,**      :

       **Defendant.**      :

        :
-----------------------------------------------------------------X

## BAYER CROPSCIENCE AG'S  RESPONSIVE MARKMAN BRIEF

OF COUNSEL:

Robert J. Koch
Jay I. Alexander
Arie M. Michelsohn
MILBANK, TWEED, HADLEY &
McCLOY LLP
1850 K Street NW, Suite 1100
Washington, DC  20006
(202) 835-7500
rkoch@milbank.com
jalexander@milbank.com
amichelsohn@milbank.com


Dated:  May 14, 2012

Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Anne Shea Gaza (#4093)
Travis S. Hunter (#5350)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
cottrell@rlf.com
moyer@rlf.com
gaza@rlf.com
hunter@rlf.com

*Attorneys for Plaintiff*
*Bayer CropScience AG*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................... ii

SUMMARY OF ARGUMENT ................................................................................................... 1

    A.   "The Biological Activity of 2,4-D Monooxygenase." ............................................. 2

    B.   "A DNA sequence encoding a polypeptide." ........................................................ 11

    C.   "Capable of Being Expressed in a Plant." ............................................................. 14

    D.   "ATransgenic Plant Containing a Recombinant Gene."

CONCLUSION ......................................................................................................................... 19

## TABLE OF AUTHORITIES

Page(s)

CASES

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
   659 F.3d 1121 (Fed. Cir. 2011)...............................................................12, 17

*Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*,
   674 F.3d 1365 (Fed. Cir. 2012)..................................................................8, 17

*AIA Engineering Ltd. v. Magotteaux Int'l S/A*,
   657 F.3d 1264 (Fed. Cir. 2011)........................................................................2

*Daiichi Pharm. Co. v. Apotex, Inc.*,
   2006 WL 2065049 (D.N.J. July 21, 2006)......................................................5

*Digital-Vending Services Int'l, LLC v. University of Phoenix, Inc.*,
   672 F.3d 1270 (Fed. Cir. 2012).....................................................................17

*Elekta Instrument S.A. v. O.U.R. Scientific International, Inc.*,
   214 F.3d 1302 (Fed. Cir. 2000).......................................................................7

*Honeywell International Inc. v. ITT Industries, Inc.*,
   452 F.3d 1312 (Fed. Cir. 2006)..................................................11, 12, 13, 16

*Liebel–Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004).......................................................................15

*Lucent Techchnologies, Inc. v. Gateway, Inc.*,
   525 F.3d 1200 (Fed. Cir. 2008).......................................................................8

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
   579 F.3d 1363 (Fed. Cir. 2009).......................................................................2

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
   474 F.3d 1323 (Fed. Cir. 2007).......................................................................7

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
   357 F.3d 1340 (Fed. Cir. 2004).................................................................12, 13

*MySpace, Inc. v. GraphOn Corp.*,
   672 F.3d 1250 (Fed. Cir. 2012).......................................................................2

*North American Container, Inc. v. Plastipak Packaging, Inc.*,
   415 F.3d 1335 (Fed. Cir. 2005).......................................................................8

*Oatey Co. v. IPS Corp.*,
   514 F.3d 1271 (Fed. Cir. 2008)..................................................................................8

*PC Connector Solutions LLC v. SmartDisk Corp.*,
   406 F.3d 1359 (Fed. Cir. 2005)..............................................................................5, 10

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)............................................................... *passim*

*Praxair, Inc. v. ATMI, Inc.*,
   543 F.3d 1306 (Fed. Cir. 2008)..............................................................................13, 17

*Rambus Inc. v. Infineon Techs. AG*,
   318 F.3d 1081 (Fed. Cir. 2003)..............................................................................13, 17

*Sanofi-Aventis Deutschland GmbH v. Genentech, Inc.*,
   2012 WL 1178059 (Fed. Cir. Mar. 22, 2012).....................................................5, 15

*Schering Corp. v. Amgen Inc.*,
   222 F.3d 1347 (Fed. Cir. 2000).................................................................................6

*Textron Innovations Inc. v. Toro Co.*,
   2006 WL 6209924 (D. Del. Oct. 20, 2006) ........................................................13, 17

*Verizon Serv. Corp. v. Vonage Holdings Corp.*,
   503 F.3d 1295 (Fed. Cir. 2007)..............................................................................12, 13

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)..................................................................................7, 19

*Voda v. Cordis Corp.*,
   536 F.3d 1311 (Fed. Cir. 2008)..............................................................................13, 17

**OTHER AUTHORITIES**

R. Old and SB Primrose, *Principles of Gene Manipulation: an introduction to genetic
   engineering*, Third Ed. 1985, Blackwell Scientific Publications...........................15

## SUMMARY OF ARGUMENT

DAS deliberately chose to make an end run around the laborious endeavor of discovering a non-infringing 2,4-D resistance gene by using Bayer's patented *tfdA* gene as the basis of its gene discovery efforts rather than develop its own, independent approach.  DAS now seeks a free ride on Bayer's proprietary technology by proffering constructions of the '401 patent claims that contradict the intrinsic evidence.   But as long as this Court adheres to well-established principles of claim construction,  DAS will not succeed.

As disclosed in its own scientific publications, DAS's gene discovery efforts consisted of nothing more than searching a public protein database for TfdA "homologs"—enzymes having the same region of conserved amino acids as TfdA known to be responsible for its 2,4-D monooxygenase activity—from bacteria known to degrade 2,4-D or related chemical compounds. From there, it was simple to obtain the corresponding gene sequence encoding the homologous enzyme in the related gene database.   All that remained was for DAS to (i) confirm that the genes it selected, in fact, possessed the biological activity of 2,4-D monooxgenase by cleaving the side chain to produce 2,4-DCP and glyoxylate, and (ii) deceptively rename the genes to try to cover up the fact that they have the same biological activity as the genes claimed in Bayer's '401 patent. This took DAS all of about four months in 2003, providing DAS with a fourteen-year head start on the process of integrating the gene into commercial plant varieties and obtaining regulatory approval that it should not have had because the '401 patent expires in 2017.

Now, confronted with the reality of Bayer's patent infringement suit, DAS has no choice but to hope this Court agrees with its erroneous claim constructions, one of which would lead to the absurd result of the '401 claims excluding the exemplary embodiment (the *tfdA* gene); a second of which would result in the '401 patent claiming *only* the *tfdA* gene; and a third of which would equate bacteria to plants.   Because none of DAS's proposed constructions are correct, the Court

should reject DAS's proposals and adopt Bayer's proposed constructions.    Summary judgment of

infringement should therefore follow.

###### A.    "The Biological Activity of 2,4-D Monooxygenase."

*The Claim Limitation is Defined in the Patent Specification:*   The claim limitation in

issue is "the *biological activity* of 2,4-D monooxygenase."   DAS attempts to focus only on the

term "monooxygenase" divorced from the context in which it is used, but the Federal Circuit has

admonished that "[t]rial courts analyzing claim limitations should strive to connect those

limitations to the context of the claim as a whole … patent claims are not judged solely by their

individual limitations."  *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1257 (Fed. Cir. 2012).

An inventor is entitled to define, in the patent specification, the terms he uses in the

claims.[1]   In this case, the '401 patent defines the phrase "biological activity of 2,4-D

monooxygenase."   The patent specification uses the phrase "biological activity" exactly twice.

These passages define the meaning intended by the inventors.   At col. 2, lines 25-27, the patent

describes the biological activity of the enzyme encoded by the exemplary *tfdA* gene disclosed in

the patent as having the ability to "bring[] about the cleavage of the side chain of 2,4-D":

> 25    The tfdA gene codes for 2,4-D-monoamine oxygenase, a
> polypeptide having the biological activity of bringing about
> the cleavage of the side chain of 2,4-D; therefore, the ability

---

[1] This is true even if the definition contradicts the usage of the words in dictionaries or other sources.  *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009) ("the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs. . . . When a patentee defines a claim term, the patentee's definition governs, even if it is contrary to the conventional meaning of the term.") (internal citations omitted); *AIA Engineering Ltd. v. Magotteaux Int'l. S/A*, 657 F.3d 1264, 1276 (Fed. Cir. 2011) ("In this case, the intrinsic evidence reveals that the patentee acted as his own lexicographer and used 'homogeneous solid solution' as a synonym for 'homogeneous ceramic composite.'").  However, as discussed below, the inventors' definition in this case does not contradict the technical understanding of those of ordinary skill in the art at the time.

(Exh. A at 2:25-27).[2,3]    The patent further equates the "biological activity of the protein encoded by [the] tfda [gene]" to "its 2,4-D monooxygenase activity":

> Another aspect of this invention relates to plasmids containing the gene tfda or genes substantially identical to tfda
> 65 (e.g., hybridizing with the gene of this invention and coding for a protein which has the biological activity of the protein encoded by tfda, e.g., its 2,4-D-monooxygenase activity), as

(Exh. A at 2:63-67).

These passages provide an unequivocal definition of "the biological activity of 2,4-D monooxygenase" as "bringing about the cleavage of the side chain of 2,4-D" and many other passages in the patent specification are consistent with this definition.  (*See* Exh. A at 3: 27-29; 7:19-24; 23:58 to 24:16; 25:10-42; 27:14-37).[4]    ***The inventors' clear definition in the patent of what they meant by the phrase "biological activity of 2,4-D monooxygenase" is dispositive.***

Moreover, the definition makes sense because the key disclosure in the patent is of a test that is capable of identifying a gene from any bacterium that encodes an enzyme that will convert 2,4-D to 2,4-DCP by cleavage of the side chain.  The test developed by the inventors—called a "complementation assay"—involved creation of "mutant" strains of *Alcaligenes eutrophus* bacteria (identified as "JMP134:Tn5-2" and "JMP134:Tn5-4") in which the *tfdA* gene was disabled.  Fragments of DNA from a soil bacterium known to degrade 2,4-D can be added to the mutant

---

[2] Note that the Patent Office has now corrected the typographical error in this passage— "monoamine oxygenase" has been corrected to "monooxygenase." (Exh. B).

[3] Exhibits referenced herein are appended to the Declaration of Edward J. Mayle in Support of Bayer's *Markman* Reply Brief, filed herewith.

[4] Because herbicide chemistry can be difficult to understand, Bayer has introduced a declaration from its expert, Dr. Robert Hausinger, simply to explain that "cleavage of the side chain of 2,4-D" refers to the chemical reaction by which the herbicide 2,4-D is converted to the less toxic by product called 2,4-Dicholorophenol ("2,4-DCP"). (Exh. C, Hausinger Decl. ¶¶8-13). Importantly, DAS's expert, Dr. Bollinger, does not disagree with Dr. Hausinger as to the material facts of how this chemical reaction proceeds. (Exh. D, Bollinger Dep. at 19:20 to 20:19; 24:2 to 25:4; 50:16 to 51:9).

strain to determine whether any such DNA fragment "complements" the mutant so as to restore its ability to convert 2,4-D to 2,4-DCP.   A DNA fragment that restores the bacteria's ability to degrade 2,4-D must therefore contain a gene that encodes an enzyme having this function.   The inventors' assay is thus a universal screening tool to find any gene that encodes the biological activity of converting 2,4-D to 2,4-DCP by side chain cleavage.   (Exh A at col. 2: 25-27; Exh. C, Hausginer Decl. ¶7; Exh. E, Hausinger Dep. at 51:5-17; 52:6-17; 54:1-9; 183:7 to 184:25;  Exh. F, Jones Decl. ¶10-13.   The complementation assay will be addressed in detail in Bayer's opposition to DAS's motion for summary judgment of invalidity under 35 U.S.C. 112, which opposition will be filed on May 15, 2012).

DAS argues that the clear, unambiguous passages in the patent specification cited above do not sufficiently define "biological activity of 2,4-D monooxygenase" because they lack the "necessary clarity, deliberateness and precision" needed for a special definition of a claim term. (D.I. 214 at 15-17).   The basis of DAS's argument is that the inventors failed to include "clear words signaling" that they intended to "redefine terms from how they are used by those in the art." (D.I. 214 at 16).   This argument is fatally flawed because, as discussed next, it is undisputed that, at the time the patent specification was written in 1986, the art believed the exemplary TfdA enzyme encoded by the *tfdA* gene (discovered using the inventors' complementation assay) was a "2,4-D monooxygenase."   Nothing needed "re-defining" because the inventors used the art-accepted terminology to identify the enzyme in the patent.[5]

---

[5] DAS argues that Bayer ignores the words "having" and "bringing about" contained in the cited passages.   (D.I. 214 at 16-17).   DAS is wrong because, as the experts agree, the TfdA enzyme undisputedly "has" the activity of bringing about cleaving the side chain of 2,4-D.   Technically, the enzyme "brings about" the cleavage by causing a hydroxylation reaction that forms an unstable intermediate compound which spontaneously degrades to 2,4-DCP.   (Exh. D, Bollinger Dep. at 23:22 to 25:4;  Exh. E, Hausinger Dep. at 82:24 to 83:13).   DAS accuses Bayer of "ignoring" the fact that the enzyme may have additional "activity"—*i.e.*, it causes additional chemical reactions.

***The Inventors' Definition is Consistent With Usage at the Time:***   The inventors' terminology was <u>perfectly consistent</u> with usage in the mid-1980s because at that time, the TfdA enzyme encoded by the *tfdA* gene was believed to be a "2,4-D monooxygenase."  (Exh. C, Hausinger Decl. ¶¶14-18; Exh. E, Hausinger Dep. 9:22 to 10:1; 12:1-3; 46:8-120).  In fact, it was not until 1993 that Bayer's expert, Dr. Hausinger, first published the discovery that the TfdA enzyme is actually a "2,4-D/α-ketoglutarate dependent dioxygenase." (*Id.* 8:19-25; 9:12-20). <u>DAS's expert, Dr. Bollinger, agrees with this historical narrative.</u> (Exh. D, Bollinger Dep. at 55:14 to 56:10; D.I. 217, Bollinger Decl. at ¶¶14-15).

A patent claim must be construed from the viewpoint of one of ordinary skill in the art <u>at the time of the patent filing</u>, which in this case, is 1986.[6]  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (The "meaning of [a] claim must be interpreted as of the effective filing date of the patent application.") (internal quotations and citation removed); *PC Connector Solutions LLC v. SmartDisk Corp.*, 406 F.3d 1359, 1363 (Fed. Cir. 2005) ("A claim cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date."); *Daiichi Pharm. Co. v. Apotex, Inc.*, 2006 WL 2065049, at *2 (D.N.J. July 21, 2006) (rejecting reliance on later-published dictionary definitions because the dictionary in question "does not provide accurate definitions as they were known at the time the patent was filed and, therefore, has no place in this suit.").  Indeed, the Federal Circuit just recently decided another case based on this very point of law.  *Sanofi-Aventis Deutschland GmbH v. Genentech, Inc.*, 2012 WL 1178059, at *6 (Fed. Cir. Mar. 22, 2012) ("Regardless of what meaning may be attributed to the term 'plasmid' in

---

Bayer does not ignore this fact; it is just irrelevant to claim construction because the activity with which the inventors were concerned was the conversion of 2,4-D to 2,4-DCP.  (*Id.* at 13:13-18).

[6] The German language priority application was filed in Germany in August 1986.  That same application was filed in August 1987 under the terms of the Patent Cooperation Treaty designating the United States. (*See* D.I. 112 at 3, n.3; D.I. 114-3, D.I. 114-4).

other contexts and at other times, its meaning in the instant patent, having an effective filing date of August 24, 1984, is as a circular, extrachromosomal piece of DNA."). Even if science has advanced to the point where new knowledge has rendered obsolete the terminology used in the patent, the Court "must determine what the term meant at the time the patentee filed the [patent] application." *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353 (Fed. Cir. 2000). **DAS nowhere disputes this bedrock principle of patent law.**

One prominent example of the prior art usage of the term "2,4-D monooxygenase" during the relevant time is in a 1985 publication by Don *et al.*, which is cited in the '401 patent. (Exh. A at 1:50-51). As can be seen, Don *et al.* called the TfdA enzyme that degrades 2,4-D a "2,4-D monooxygenase," although Don was unable to isolate the gene that encodes this enzyme:

> The inability to isolate mutants in the first step of 2,4-D degradation, 2,4-D monooxygenase, could be due to either specificity of insertion of the transposons, resulting in lack of insertions in a plasmid-borne gene, or the fact that the gene is chromosomally encoded. The first possibility appears

(Exh. G at DAS0000783; *see also id.* at DAS0000782, caption under Fig. 1). Dr. Bollinger agrees. (Exh. D, Bollinger Dep. at 65:12-19; 75:5-14; 79:1-15). Dr. Bollinger also does not dispute that persons in the art have used the term "2,4-D monooxygenase" to refer to the TfdA enzyme continuously from before 1986 to the present day, even after Dr. Hausinger correctly identified the enzyme as a "2,4-D/α-ketoglutarate dependent dioxygenase" in 1993. (Exh. D, Bollinger Dep. at 104:20 to 105:18; 106:2-21; 107:1 to 108:4; 108:11 to 109:13; 109:19 to 111:6; Exhs. H-L).

The only place in its brief where DAS attempts to dispute this point is where it argues that Bayer's construction is contrary to the rule of law because "the meaning of monooxygenase is the same today as it was when the patent application was filed." (D.I. 214 at 17). DAS's own statement reveals the fatal flaw in its argument—the issue before the Court is not the evolution of the meaning of the term "monooxygenase" divorced from the context of the patent. The issue is

what the inventors meant by the phrase <u>"biological activity of 2,4-D monooxygenase"</u> when they filed the patent in 1986.  That meaning remains the same now as when the inventors defined it consistently with the understanding of the art at the time:  the activity of bringing about the cleavage of the side chain of 2,4-D.

***DAS's Construction Leads to the Absurd Conclusion that the Inventors Did Not Claim the Exemplary tfdA Gene Disclosed in the Patent:***   A claim construction that excludes the preferred embodiment described in the patent specification is "rarely, if ever, correct."  *See, e.g.*, *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).  This is exactly the result that DAS urges the Court to reach.  According to DAS, the patent claims should be construed to <u>exclude</u> the *tfdA* gene that was disclosed as the exemplary embodiment in the patent because the TfdA enzyme encoded by that gene is now understood to be a "2,4-D/α-ketoglutarate dependent dioxygenase" rather than a "2,4-D monooxygenase" as a result of Dr. Hausinger's research published in 1993.  DAS acknowledges the case law holding that it is "rarely" correct to construe a patent claim to exclude the preferred embodiment, but argues that this is one of those rare cases.  (D.I. 214 at 11).

DAS is wrong because no court has ever deviated from the normal rule in a case such as this.  None of the authority DAS cites is pertinent to this case.  In *Elekta Instrument S.A. v. O.U.R. Scientific International, Inc.*, 214 F.3d 1302, 1307-08 (Fed. Cir. 2000), the claim limitation at issue was drawn to a radiation source and beam channels that were located "only within a zone extending between latitudes 30° - 45°."  The preferred embodiment disclosed sources from between 0° and 45°.  *Id.*  The claim therefore was clearly drawn to less than the entirety of the preferred embodiment and the court gave effect to this more limited scope.  This situation simply does not apply in the case of the '401 patent.

RLF1 6027011v. 1

In *Lucent Techchnologies, Inc. v. Gateway, Inc.*, 525 F.3d 1200, 1213-15 (Fed. Cir. 2008), the clear language of the claim required performance of all five steps of the claimed method "during each pulse-forming iteration."  The Federal Circuit recognized that this construction was at odds with the preferred embodiment, which described performing four of the five steps indepedently ("outside") of the pulse-forming step.  *Id.* at 1213-14.  Thus, the patentee had made a clear error in claiming its invention; an error the court refused to correct.  *Id.* at 1215.  *Lucent* is inapposite here because no "error" exists in the claim language of the '401 patent.  As discussed above, the patent defines "the biological activity of 2,4-D monooxygenase"—consistently with what the art understood to be the activity of the TfdA enzyme and consistently with the disclosure of the complementation assay—as the conversion of 2,4-D to 2,4-DCP by cleavage of the side chain.  The inventors' definition is also consistent with the undisputed practice in the art at the time of identifying the exemplary TfdA enzyme as a "2,4-D monooxygenase."

DAS's remaining citations, *Oatey Co. v. IPS Corp.*, 514 F.3d 1271 (Fed. Cir. 2008) and *North American Container, Inc. v. Plastipak Packaging, Inc.*, 415 F.3d 1335 (Fed. Cir. 2005), stand for the proposition that claims may be more limited than the disclosed embodiments where there has been a clear disclaimer of subject matter either in the patent specification or during the prosecution history.  To find such a disclaimer, however, a court must find a "clear and unambiguous disavowal of claim scope during prosecution."  *Advanced Fiber Techs. (AFT) Trust v. J & L Fiber Servs., Inc.*, 674 F.3d 1365, 1372 (Fed. Cir. 2012).  In this case, DAS argues that two aspects of the prosecution history give rise to a disclaimer.  (D.I. 214 at 14-15.)  DAS is incorrect as to both.

DAS first argues that the inventors "limited" their "invention" to "monooxygenases" because in making arguments to the patent examiner, the inventors used the term "2,4-D monooxygenase" as a short-hand description of their invention rather than referring to enzymes

-8-

that "cleaved the side chain."  (D.I. 214 at 14-15).  This argument makes no sense because the inventors had already <u>defined</u> the "biological activity of 2,4-D monooxygenase" being claimed as bringing about the cleavage of the side chain.  The phrases "2,4-D monooxygenase" and an "enzyme that cleaved the side chain" thus would have been interchangeable in this context.  Moreover, all of the statements upon which DAS relies were made to the PTO before the 1993 discovery that the exemplary TfdA enzyme is more aptly characterized as a "2,4-D/α-ketoglutarate dependent dioxygenase."  It is therefore logically impossible to conclude that the inventors were distinguishing their invention because it was a "monooxygenase" as opposed to something that was not a monooxygenase, for example, a "dioxygenase."

DAS's argument as to the second aspect of the prosecution history makes no more sense.  DAS points to the "restriction requirement" in which the patent examiner in 1991 required Bayer to elect for examination one of four distinct groups of claims originally presented in the patent application.  (Exh. E, DAS Br. at 2).  The examiner identified "Group I" as including original claims 1-9, 17-18, 23, 32, 35, and 42.  *Id.*  DAS does not present the Court with the text of these claims, but Bayer has.  (Exh. M).  Among the claims that the inventors elected to pursue in Group I was original claim 2, directed to "an isolated DNA sequence encoding a polypeptide having the biological activity of a 2,4-D monooxygenase" which, as discussed above, was defined in the patent specification consistently with the nomenclature of the time.  In fact, claim 1 of the patent as issued has aspects that are quite similar to original claim 2.   DAS's statement that the PTO "rejected" the inventors' attempt to claim more broadly than the single *tfdA* gene disclosed in the patent, (D.I. 214 at 15), therefore is completely illogical.[7]

---

[7] The Court should note that DAS has completely shifted its articulation of this argument from the infringement summary judgment briefing where DAS attempted to focus on the non-election of claims drawn to the bacterial mutants used in the complementation assay.  (*Compare* D.I. 214 at 15

*DAS's Entire Argument Hinges on Extrinsic Dictionary Definitions Divorced from the Context of the Patent:* "The main problem with elevating" extrinsic sources "to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Phillips*, 415 F.3d at 1321. "There is no guarantee that a term is used in the same way in a treatise as it would be by the patentee. In fact, discrepancies between the patent and treatises are apt to be common because the patent by its nature describes something novel." *Id*. at 1322. DAS attempts to lead the Court into this exact trap.

DAS's primary argument, as articulated at pages 8-11 of its Opening Brief, (D.I. 214), is that "monooxygenase" should be understood in the way it is defined in textbooks. This argument is fatally flawed because it ignores the context in which the word is used in the actual claim limitation: "biological activity of 2,4-D monooxygenase." As emphasized above, the Court must view the claim limitation as a whole, in context, and it is improper to focus on the single word "monooxygenase" divorced from that context. The inventors defined the phrase "biological activity of 2,4-D monooxygenase" as "bringing about the cleavage of the side chain of 2,4-D." Any definition that contradicts the definition in the patent cannot be relied upon under *Phillips*.

Moreover, as is also undisputed, the inventors' identification of the exemplary *tfdA* gene as coding for a "2,4-D monooxygenase" was consistent with what was believed in the art. DAS is trying to use knowledge published in 1993—seven years after the patent was written—in an attempt to argue that the term "2,4-D monooxygenase" must be given a different meaning now than was commonly understood at the time. But this is clearly contrary to the Federal Circuit law that DAS has never challenged. *See, e.g.*, *PC Connector Solutions*, 406 F.3d at 1363 ("A claim

---

with D.I. 172 at 16). That argument was also wrong and DAS now seems to have abandoned it. (*See* D.I. 188 at 10-12).

cannot have different meanings at different times; its meaning must be interpreted as of its effective filing date.").

In short, DAS's citations to extrinsic sources to contradict the defined meaning of the claim limitation in the patent cannot be credited as a matter of law. Bayer's definition of "biological activity of 2,4-D monooxygenase" is therefore the correct definition, based on the intrinsic evidence.

**B.     "A DNA sequence encoding a polypeptide."**

DAS concedes that its proposed construction of "a DNA sequence encoding a polypeptide" is diametrically opposed to its construction of "biological activity of 2,4-D monooxygenase." Under the latter construction, as discussed above, the '401 claims would completely <u>exclude</u> the exemplary *tfdA* gene discovered by the inventors using their complementation assay. Under the former construction, DAS urges the Court to limit the claims <u>only</u> to the *tfdA* gene. (D.I. 214 at 18-21). For this reason, DAS dubs its proposed construction of "a DNA sequence encoding a polypeptide" as an "alternative" although even here, DAS equivocates when it claims this to be a "very unique case." (D.I. 214 at 20-21).

Regardless of how DAS frames its argument as to "a DNA sequence encoding a polypeptide," it is wrong. DAS first points to several passages in the specification using the phrase "this invention," or words to that effect, and then makes the illogical leap that this boilerplate narrowly limits the claims to only the *tfdA* gene, notwithstanding the claim language. (D.I. 214 at 18-19). According to DAS, *Honeywell International Inc. v. ITT Industries, Inc.*, 452 F.3d 1312 (Fed. Cir. 2006) "is directly on point." (D.I. 214 at 19). It is not. The critical fact in *Honeywell* was that the claimed fuel filter was disclosed in the specification as the <u>only embodiment</u> of the invention: "the entire specification of the … patent, as well as the sole drawing, describe the elements and operation of a fuel filter with electrically conductive fibers. No other parts are

described."  *Honeywell*, 452 F.3d at 1316.  "Given the written description, the district court concluded that 'the patentee characterized a fuel filter as the only embodiment of his invention, not merely a 'preferred' version of all possible embodiments.'"  *Id.*  The Federal Circuit affirmed because "the written description *does not indicate that a fuel filter is merely a preferred embodiment* of the claimed invention."  *Id.* at 1318 (emphasis added).

In contrast to the patent in *Honeywell*, the '401 patent specification makes clear that the "foregoing preferred specific embodiments are, therefore, to be construed *as merely illustrative and not limitative of the remainder of the disclosure in any way whatsoever*."  (Exh. A at 31:64-67) (emphasis added).  Further, according to the patent, "one skilled in the art can easily ascertain the essential characteristics of the invention and … can make various changes and modifications of the invention to adapt it to various usages and conditions."  (*Id.* at 32:5-10).  This is the natural result of the patent's disclosure of the complementation assay, which can be used to screen for any gene that has the "biological activity of 2,4-D monooxygenase" as discussed above.  The facts in *Honeywell* are therefore completely opposite the facts in this case.[8]

The Federal Circuit has repeatedly made clear that *Honeywell* and the other cases on which DAS relies (*Verizon*, and *Microsoft*) are narrowly confined to their facts.  *See, e.g.*, *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136-37 (Fed. Cir. 2011) (explaining that the use of the phrase "present invention" or "this invention" is not limiting where the references to a certain limitation "are not uniform" or where "other portions of the intrinsic evidence do not

---

[8] DAS's other cases are similar to *Honeywell* and are no more pertinent.  *See Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1348 (Fed. Cir. 2004) (limiting claims because statements in specification were "not limited to describing a preferred embodiment"; statements made clear a telephone line was required and "[n]owhere does it even suggest the use of a packet-switched network"); *see also Verizon Serv. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) (citing *Honeywell* for proposition that disclosure may be limiting when it does not make clear a feature is merely a preferred embodiment but describes "the 'present invention' *as a whole*") (emphasis added).

support applying the limitation to the entire patent") (distinguishing *Honeywell* and *Verizon*).[9]   The

Federal Circuit's default rule is that the embodiments in the specification should not be read into

the claims: "although the specification often describes very specific embodiments of the invention,

we have repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d

at 1323.   DAS raises a red flag by relying on the *Honeywell* line of cases, which do not support

contravening the general rule in this case.

Perhaps most importantly, DAS fails to address the abundant intrinsic evidence in the claim

language, the specification, and the prosecution history which show that "a DNA sequence

encoding a polypeptide" is not limited to the *tfdA* gene.   For example, the very first column of the

specification makes clear that "*many* 2,4-D degrading organisms [*i.e.*, bacteria]" have genes

encoding 2,4-D monooxygenases.   (Exh. A at 1:21-26) (emphasis added) (listing five such

bacteria).   Other such intrinsic evidence is cited in Bayer's previous briefs.   (*See* D.I. 209 at 6-10;

D.I. 188 at 12-13).   The complementation assay described above is designed to identify any gene

that encodes a polypeptide (of which an enzyme is an exemplar) having the requisite "biological

activity of a 2,4-D monooxygenase" (*i.e.*, that cleaves the side chain of 2,4-D).   Given the

---

[9] *See also Voda v. Cordis Corp.*, 536 F.3d 1311, 1320-22 (Fed. Cir. 2008) (although parts of  the specification referred to a certain embodiment as the "present invention," the specification did not uniformly refer to the invention as being so limited, and the prosecution history did not reveal such a limitation); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1326 (Fed. Cir. 2008) (references to a specific embodiment as "the apparatus of this invention" and "a useful feature of this invention" in the specification "are contradicted by a number of express statements in the '609 specification clearly indicating that [the feature at issue] is a feature only of certain embodiments"); *Rambus Inc. v. Infineon Techs. AG*, 318 F.3d 1081, 1094-95 (Fed. Cir. 2003) (although portions of the written description referred to the term at issue as limiting the claimed invention to a preferred embodiment, "the remainder of the specification and the prosecution history shows that Rambus did not clearly disclaim or disavow such claim scope in this case").   *Accord, Textron Innovations Inc. v. Toro Co.*, 2006 WL 6209924, at *4 (D. Del. Oct. 20, 2006) (distinguishing *Microsoft*, "the prosecution history does not confirm or support a narrow reading of the claims").

overwhelming intrinsic evidence that the invention is claimed more broadly than the exemplary *tfdA* gene, it is clear that DAS's authority is inapposite.

### C.    "Capable of Being Expressed in a Plant."

DAS argues that "the '401 patent describes 'the invention' as having multiple necessary aspects," one of which is that it is limited to *tfdA* (*see* the previous section) and another is that the invention "relates to plants with 2,4-D tolerance."  (D.I. 214 at 21).  From this, DAS makes the unwarranted and illogical leap that <u>all</u> of the claims "must be construed to require 2,4-D tolerance *in a plant*."  (*Id.*) (emphasis added).  Under DAS's construction, even claims directed to "recombinant genes" alone (*e.g.*, claim 1) and those directed only to "bacterial strains" containing a gene (*e.g.*, claim 11) must be construed to require expression <u>in a plant</u>.  But genes are not plants, and neither are bacteria.  At bottom, DAS's untenable construction is based on a contrived reading of the intrinsic evidence and a misapplication of Federal Circuit law.

Claim 1, as is clearly discernible from its plain language, is directed to a "recombinant gene" (*i.e.*, a DNA sequence) that both (i) encodes a polypeptide having the requisite activity and (ii) is "capable of being expressed in a plant."  As Bayer has explained, the claimed gene is "capable of being expressed in a plant" by virtue of its being "operably linked" to another DNA sequence that is a "promoter capable of promoting expression" of such a gene.  (D.I. 209 at 11-17).  DAS <u>admits</u> that "claim 1 does not expressly refer to 2,4-D tolerance."  (D.I. 214 at 23).  Despite its admission that the plain language of the claim does not support its position, DAS urges the Court to read into this claim a limitation that requires actual expression in a plant of a protein that confers resistance to 2,4-D.

***The Overall Scheme of the Claims:***  In so arguing, DAS completely ignores the overall scheme of the claims, which includes claims directed to various features of the invention.  As Bayer has explained, the patent includes claims directed to a "recombinant gene" and vectors and

plasmids[10] containing such a gene (claims 1, 4-10); to a "transgenic plant" containing such a gene (claims 2-3); to a "transformed bacterial strain" containing such a gene (claim 11); to either a "transgenic microorganism or plant" containing such a gene (claim 13); and to a "method of preparing a polypeptide" using the bacterial strains and vectors and plasmids of the previous claims (claims 12, 14-16).  (D.I. 209 at 2-3; Exh. A at 32:12-65).

Claims 2-16 are all dependent upon claim 1 and therefore, as a matter of law, imply further limitations to claim 1.  *See, e.g.*, *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004) ("As this court has frequently stated, the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim.").  The fatal flaw in DAS's argument—in addition to the fact that it contradicts the claim language—is that it requires claim 1 (a gene claim) to contain a limitation (actual expression in a plant of a protein to a threshold level required to confer resistance to 2,4-D) that can only apply to a claim to a plant.  But claims 2-3 are the claims directed to a plant; not claim 1.  DAS's argument also ignores claim 11, which is directed to a "bacterial strain" that contains the gene of claim 1.  While a bacterial strain can express a gene that is also capable of being expressed in a plant, a bacterial strain is not a plant; and thus a claim to a bacterial strain cannot require expression in a plant.

---

[10] The terms "plasmid" and "vector" are not in dispute.  A plasmid is a typically circular molecule of DNA existing in a cell that is capable of independently replicating in the cell outside of a chromosome.  R. Old and SB Primrose, *Principles of Gene Manipulation: an introduction to genetic engineering*, Third Ed. 1985, Blackwell Scientific Publications.  *Sanofi-Aventis*, 2012 WL 1178059, at *6 (the meaning of a plasmid "is as a circular, extrachromosomal piece of DNA.").  A plasmid is a "vector" when used in genetic engineering as a vehicle to clone and/or express genes in cells.  For example, Figs. 2-7 of the '401 patent are schematic diagrams of the various plasmid vectors used in the invention. "Plasmid" and "vector" are typically used interchangeably in molecular biology and refer to genetically engineered plasmids as opposed to naturally occurring plasmids in cells. For example, Figs. 2-7 of the '401 patent are schematic diagrams of the various engineered plasmid used in the invention.

*The Description in the Specification:*  The Court should be skeptical as DAS again relies

on the exceedingly narrow *Honeywell-Microsoft-Verizon* line of cases.  (D.I. 214 at 23).  DAS

attempts to set up an analogy to those cases by citing the first paragraph of the specification, which

it offers as proof that the "invention" is limited to plants.  (D.I. 214 at 21, citing '401 patent at

1:11-20).  But DAS badly ellipsizes this paragraph, leaving out the language that pertains to other

aspects of the invention, including genes.  Below is the paragraph in question.  The highlighted

text is what DAS elided from its quotation:

> The present invention relates to the production, by genetic engineering, of plasmids and bacterial strains containing the gene tfdA, or a gene essentially identical to tfda, on a short, exactly characterizable DNA segment. The novel plasmids and microorganisms are especially well suited for the production of 2,4-D-monooxygenase, as well as for serving as starting compounds for the genetically engineered transfer of the 2,4-D-degrading properties of this enzyme to various organisms (including the thus-attainable 2,4-D-tolerance in genetically transformed plants).

(Exh. A at 1:11-20).  As can be seen, the language DAS omits refers to "DNA segments",

"plasmids" and "microorganisms"—each of which are also claimed features in addition to plants.[11]

DAS's selective editing is thus designed to confuse the Court into believing that the specification

discusses the invention only in terms of plants; it does not.  The *Honeywell* line of cases therefore

does not apply.  The specification clearly does not limit "the invention" to plants, and every claim

does not require "expression in a plant," as DAS would have it.  Thus, the more apt authorities are,

---

[11]  The specification elsewhere conveys the description of several "aspects" of the invention; namely, (1) a bacterial "mutant" which lacks the 2,4-D monooxygenase gene (Exh. A at 2:52-62); (2) "plasmids" (recombinant DNA) containing genes encoding enzymes having 2,4-D monooxygenase activity (*id.* at 2:63-67); (3) "bacterial host/plasmid strains" for producing 2,4-D monooxygenase or for transferring this ability to other organisms (*id.* at 3:3-6); and (4) "transgenic organisms," preferably microorganisms and plants (*id.* at 3:7-10).  DAS's construction even contradicts the title of the patent, "Microorganisms and Plasmids For 2,4-Dichlorophenoxyacetic Acid (2,4-D) Monooxygenase Formation…."

*e.g.*, *Absolute Software*, 659 F.3d at 1136-37; *Voda*, 536 F.3d at 1320-22; *Praxair*, 543 F.3d at 1326; *Rambus*, 318 F.3d at 1094-95; and *Textron*, 2006 WL 6209924, at *4, where courts carefully considered the claim limitation in question in view of all of the intrinsic evidence.

***The Prosecution History:*** Finally, DAS asserts that the declaration filed by the lead inventor, Dr. Streber, as well as arguments made in the prosecution history, serve to limit all of the claims only to plants having the requisite tolerance to 2,4-D. (D.I. 214 at 24). While DAS is correct that statements in the prosecution history can be relevant to claim construction, none of the statements DAS cites rises to the level of a clear disavowal of claims that are drawn only to a "recombinant gene" (*e.g.*, claim 1) nor do any of the statements contradict the description of the <u>various aspects</u> of the invention set forth in the specification. *See Advanced Fiber*, 674 F.3d 1365, 1372; *Digital-Vending Services Int'l, LLC v. University of Phoenix, Inc.*, 672 F.3d 1270, 1276 (Fed. Cir. 2012) ("Because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes. ... For this reason, it is particularly important not to limit claim scope based on statements made during prosecution 'absent a clear disavowal or contrary definition.'") (internal citations omitted).

In short, DAS's position cannot be accepted because it is entirely inconsistent with the intrinsic evidence; *i.e.*, the claim language, the language of other claims in the patent, the specification and the prosecution history.

> **D.    "A Transgenic Plant Containing a Recombinant Gene."**

DAS again bases its argument on an extrinsic dictionary definition divorced from the context of the intrinsic evidence. (D.I. 214 at 24-25, citing the 1993 Oxford English Dictionary). But, as the Federal Circuit has held, "extrinsic evidence may be useful to the court, but it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context

of the intrinsic evidence." *Phillips*, 415 F.3d at 1319.  As Bayer has explained, the difference between claim 2 (which contains no narrowing limitation as to the nature of the transformation of the plant cell) and the narrower claim 3 (which specifies that the gene contained in the plant is "operably incorporated in the genome" of the plant) reveals the clear intention by the inventors to omit the requirement of "stable" transformation from claim 2.  (D.I. 209 at 17-18).  This is consistent with 35 U.S.C. §112, ¶4, which requires that a dependent claim "shall be construed to incorporate by reference all the limitations of the claim to which it refers," and must "specify a *further* limitation."  (emphasis added).  If claim 2 includes a "stable transformation" limitation, claim 3 does not add a "further limitation."  This cannot be right as a matter of law.

DAS's reading is also inconsistent with the remainder of the intrinsic evidence.  (D.I. 209 at 18-20).  For example, claim 3 (which includes the limitation of the DNA being "operably incorporated into the genome of the host plant cell") was added during prosecution.  The inventors stated that the newly added claim was supported by a passage in the specification describing the integration of a foreign gene "*into the genome of a plant transformed therewith*."  (D.I. 209 at 19-20) (emphasis in original).  Under DAS's construction of claim 2, this amendment would have been pointless.

The '401 specification also incorporates an article by Brisson and Hohn (Plant Virus Vectors; Cauliflower Mosaic Virus, in S.P. Colowick and N. O. Kaplan (ed.), *Methods in Enzymology*, 118 : 659) (referenced at col. 8, ll. 40-42).  This article describes use of a plant viral vector, CaMV, to express, in a plant, a recombinant gene conferring resistance to a drug.   The rationale was that this engineered virus will spread throughout the plant, replicate itself, and express the gene in the process.  The gene was inserted the viral genome under the control of a viral promoter and neither the viral genome nor the recombinant gene became stably incorporated into the plant genome.  Whole plants inoculated with the virus became "systemically infected,"

-18-

and exhibited resistance to the sprayed-on drug after more than three weeks following infection. DAS completely ignores this evidence and selectively cites to disclosure of preferred embodiments referencing stable transformation of plants in a misguided effort to persuade this Court to violate black-letter law and read a limitation into the claim. *Phillips*, 415 F.3d 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"). Further, because the intrinsic evidence is unequivocal that the inventors contemplated and claimed plants that need not be stably transformed, the Court should give no weight to Dr. Yanofsky's inconsistent testimony on the meaning of "transgenic plant." *Vitronics*, 90 F.3d at 1584 ("Indeed, where the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight.").

Finally the Streber declaration in no way supports DAS's contention that the inventors contemplated only stably transformed plants. The declaration makes no mention of stable transformation or unstable transformation. DAS's contention is, again, premised on the incorrect assertion that the *only* way to confer herbicide resistance to a plant is for the gene to be stably integrated into the plant's genome. But there is no such requirement, as evidenced by the Brisson and Hohn article cited in the '401 specification.

## CONCLUSION

For the foregoing reasons and for those in Bayer's Opening Brief, Bayer respectfully urges the Court to adopt Bayer's proposed constructions and to reject DAS's constructions. Bayer further respectfully requests that the Court grant its motion for partial summary judgment of infringement of claims 1-3 and 8 of the '401 patent (D.I. 111-115).

OF COUNSEL:

Robert J. Koch
Jay I. Alexander
Arie M. Michelsohn
MILBANK, TWEED, HADLEY
   & McCLOY, LLP
1850 K Street NW, Suite 1100
Washington, DC  20006
(202) 835-7500
rkoch@milbank.com
jalexander@milbank.com
amichelsohn@milbank.com

DATED:  May 14, 2012

/s/ Travis S. Hunter
Frederick L. Cottrell, III (#2555)
Jeffrey L. Moyer (#3309)
Anne Shea Gaza (#4093)
Travis S. Hunter (#5350)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE  19801
(302) 651-7700
cottrell@rlf.com
moyer@rlf.com
gaza@rlf.com
hunter@rlf.com

*Attorneys for Plaintiff*
*Bayer CropScience AG*

RLF1 6027011v. 1

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2012, I caused to be served copies of the foregoing document in the manner indicated below and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following counsel of record:

**VIA E-MAIL**
Steven J. Balick
Lauren E. Maguire
Andrew C. Mayo
ASHBY & GEDDES, P.A.
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
lmaguire@ashby-geddes.com
amayo@ashby-geddes.com

**VIA E-MAIL**
Peter A. Bicks
Alex V. Chachkes
Joseph A. Sherinsky
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
212-506-3748
pbicks@orrick.com
achachkes@orrick.com
jsherinsky@orrick.com

Elizabeth A. Howard
ORRICK, HERINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025
(650) 614-7400
ehoward@orrick.com

Hardip B. Passananti
ORRICK, HERRINGTON & SUTCLIFFE LLP
4 Park Plaza, Suite 1600
Irvine, CA  92614
(949)567-6700
hpassananti@orrick.com

/s/ Travis S. Hunter
Travis S. Hunter (#5350)
hunter@rlf.com

RLF1 6027011v. 1